UNITED STATES of America,
Appellee,

v.

Elden TURCOTTE and Forrest
Gerry, Jr., Appellants.

Nos. 683, 729, Dockets 74–2380, 74–2408.

United States Court of Appeals,
Second Circuit.

Argued Feb. 28, 1975.

Decided April 17, 1975.

Kenneth A. Holland, Atty., Dept. of Justice, Washington, D. C. (David G. Trager, U. S. Atty., E. D. N. Y., and Peter M. Shannon, Jr., Atty., Dept. of Justice, Washington, D. C., on the brief), for appellee.

William Epstein, New York City (William J. Gallagher, The Legal Aid Society, Federal Defender Services Unit, New York City, on the brief), for appellant Elden Turcotte.

Lawrence S. Goldman, New York City (Goldman & Hafetz, New York City, on the brief), for appellant Forrest Gerry, Jr.

Before LUMBARD and OAKES, Circuit Judges, and BARTELS,* District Judge.

LUMBARD, Circuit Judge:

Elden Turcotte and Forrest Gerry, Jr., appeal from judgments of conviction entered October 11, and October 18, 1974, in the Eastern District (Platt, J.) following a jury trial at which they were convicted of obstruction of justice, 18 U.S.C. § 1503, and conspiracy to obstruct justice, 18 U.S.C. § 371, and at which Turcotte was convicted of making a false declaration to a grand jury, 18 U.S.C. § 1623.[1] Defendants argue that the evidence was insufficient to support their convictions, that the trial court made improper rulings on venue and severance, that the charge to the jury was erroneous, that the trial court improperly curtailed the cross-examination of the key government witness and that the United States Attorney improperly cross-examined Gerry. We affirm.

This case arose out of an investigation by a federal grand jury into possible violations of 18 U.S.C. § 224 (sports bribery) in the New York harness racing industry, with particular regard to the fixing of superfecta races at Yonkers and Roosevelt Raceways.[2] In connection with this investigation the grand jury tried to determine whether the registered owners of horses were the actual owners. As part of this phase of its inquiry, the grand jury investigated Gerry's relationship with drivers and trainers such as Turcotte.

Here we are concerned with the attempt allegedly made by Gerry and Turcotte to conceal Gerry's ownership of two horses—Milty Hanover and Adios Misty—from the grand jury. The government's principal witness was David Kraft, who was involved in the superfecta betting scheme and who cooperated with the government after his arrest for perjury following his first grand jury appearance.[3] As a result of Kraft's

---

* United States District Judge for the Eastern District of New York, sitting by designation.

1. Gerry was sentenced to two concurrent four-year terms of imprisonment and was fined a total of $10,000. Turcotte was sentenced to three concurrent terms of one year and one day.

2. The investigation led to the indictment of 28 individuals on sports-bribery charges. Both Turcotte and Gerry were among those tried in the resulting eleven-week trial. The jury acquitted Turcotte, but convicted Gerry. Gerry's conviction was upheld recently by this court. United States v. Gerry, 515 F.2d 130 (2d Cir. 1975). For a description of the superfecta betting scheme, see United States v. Gerry, *supra,* at 134–136.

3. Kraft pleaded guilty to race-fixing charges prior to the commencement of this trial.

cooperation the FBI was able to record three conversations which were played for the jury—two of the conversations were between Kraft and Gerry, one was among Kraft, Gerry and Turcotte.

The evidence at trial showed that although Gerry bought Milty Hanover and Adios Misty for cash, the registration form filed with the United States Trotting Association listed the owner of the horse as Kraft Hill Farms, Inc., a corporation owned by Kraft's sons. Kraft testified that Gerry asked him if he could register the horses in the corporation's name because Gerry was not licensed to own horses.[4] According to Kraft, Gerry told him he was going to resell the horses immediately and only wanted to use Kraft Hill Farms as a conduit for the transaction. The horses were not immediately resold; they were raced under the Kraft Hill Farms banner and won several purses. When Kraft began receiving the purse checks, he testified that he told Gerry that he wanted the horses taken out of the corporation's name because he was afraid that his sons would get in trouble with the New Jersey racing authorities if Gerry's activities became known. Gerry, on the other hand, claimed that he bought the two horses for Kraft and that he paid for them himself only as a favor to Kraft.

The recorded conversation of August 19, 1973, in which Kraft, Gerry and Turcotte participated was largely concerned with the two horses. When Gerry and Turcotte arrived together at Kraft's house in New Jersey, Gerry introduced Turcotte to Kraft and said, "I wanted you [Kraft] to meet him [Turcotte] just so you could straighten it out . . . so you guys would both have the same story." There followed a discussion of how Turcotte and Kraft would say they met each other and how they agreed on stabling and training arrangements for Milty Hanover and Adios Misty.

From the transcript of this conversation it appears that Kraft knew virtually nothing about the horses. For example, he did not know from whom or where Gerry bought the horses. Gerry's status as the real owner is also indicated by his desire to mask any connection he had with the horses. Most of the discussion at the August 19th meeting concerned how Turcotte and Kraft could fabricate consistent stories to explain their dealings without implicating Gerry in some crime.[5] Turcotte's later testimony before the grand jury on September 14, 1973, was amazingly similar[6] to the sto-

4. As an unlicensed owner, Gerry could not race horses although he could act as a broker in sales transactions.

5. Gerry: . . . you, you have got to say I was involved as agent for buying them for you, because if they ever should call Ray Ireland you [would] know how'd he got paid or anything else.

Kraft: He's gonna show you.

Gerry: That's what I'm saying I acted as agent.

Kraft: OK.

Gerry: For you, but he [Turcotte] doesn't have to know.

Turcotte: No, but.

Gerry: He doesn't have to know how you bought the horses or everything.

Kraft: He told us.

Turcotte: I think you mentioned it to me. I'm not gonna deny it.

Gerry: No, no.

Turcotte: I know you.

Gerry: Yeah.

Turcotte: Ah, as a matter of fact the things you, ah, you did happen to mention something, but I didn't think that[.] I know you got a lot of horses here. I don't [—] not really sure I think he said, ah, Forrest, had, had something to do with it. But I heard somebody say it in the paddocks that's all.

6. Q. Mr. Turcotte, have you driven any horses within the last nine months that you know have belonged to Forrest Gerry?

A. That I knew belonged to Forrest Gerry?

Q. Yes.

A. No. I raced horses for a Mr. Kraft Hill Farms that I was under the impression and believe they belong to Kraft Hill Farms. From my understanding just rumors going around, I don't know if there's any truth to it that Forrest Gerry was the agent on these horses that they were bought by him for Kraft Hill Farms. The horses were sent to me registered for Kraft Hill Farms. The money that these horses earned was sent to Kraft Hill Farms. The claim check, when it was claimed, went to

ry that seemed to have been concocted at the August 19th meeting.[7]

### I

Gerry and Turcotte first challenge the sufficiency of the evidence against them. Turcotte claims that the government did not establish that his testimony before the grand jury was knowingly false as is required to sustain a conviction under 18 U.S.C. § 1623.[8]

■ There was sufficient evidence from which the jury could infer that Turcotte knowingly testified falsely. Turcotte's claim that he was an innocent bystander at the August 19th meeting is not borne out by the transcript of that meeting. He actively participated in the fabrication of a story concerning the ownership of Milty Hanover and Adios Misty. The answers he gave the grand jury's question were quite similar to what he proposed to tell at the August 19th meeting. The evidence was sufficient to sustain Turcotte's conviction. United States v. Sweig, 441 F.2d 114, 117 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971).

Both Gerry and Turcotte claim that their convictions for obstruction of jus-

tice should be reversed because they did not know that Kraft was going to be called before the grand jury, a fact they contend is an essential element of an obstruction of justice case. We find this argument to be unconvincing. Gerry and Turcotte knew that there was a pending federal grand jury investigation into race fixing and hidden ownership of horses. The transcript of the August 19th conversation establishes beyond any doubt that defendants were fabricating a story about Adios Misty and Milty Hanover to tell an inquiring authority. Defendant's suggestion that the story was to be presented to the New Jersey Racing Commission in the event it investigated Kraft's sons is unpersuasive. At the time of the August 19th meeting that body, so far as appears from the record, was not investigating Kraft Hill Farms, Kraft, Kraft's sons. Gerry, or Turcotte.[8a] Indeed, the August 19th meeting appears to have been arranged by Gerry, not by Kraft, and the fabricated story came mainly from Turcotte's lips. Since neither Gerry nor Turcotte had anything to fear from (or even any interest in) a New Jersey investigation, it is difficult to believe that the object of the meeting was to prepare for a New Jersey investigation.[9] On the other

---

Kraft Hill Farms and Kraft Hill Farms as far as I'm concerned, still owes me the money. Now as far as Forrest Gerry owning the horses, not to my knowledge.

**7.** The other two conversations recorded by the government, and a part of the August 19th conversation from which Turcotte was excluded, dealt with the superfecta race-fixing scheme in which Kraft and Gerry were involved.

**8.** 18 U.S.C. § 1623(a) provides:

Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**8a.** In a petition for rehearing we are informed by Gerry's counsel that "in a telephone conversation" he was told by the steward for the New Jersey Harness Racing Commission that a state investigation of Kraft Hill Farms and the two Kraft sons had begun on August 15, 1973. This fact was not established at trial; nor was it shown when, if ever, the New Jersey authorities informed Kraft that they were conducting an investigation. In any event, Kraft testified at the trial that the attempts to influence his testimony concerned the federal investigation and not any New Jersey investigation. Transcript at 422.

**9.** At the August 19th meeting Turcotte indicated he wanted to meet Kraft so if "they" ever put Kraft in a lineup with FBI agents and asked Turcotte to identify Kraft, he would not pick an FBI agent out of ignorance. Although it is not clear to whom "they" refers, the reference to the FBI in this statement shows that Turcotte was concerned with the federal investigation not a possible New Jersey investigation.

hand, the ongoing federal investigation into race fixing which was known to and concerned both Gerry and Turcotte, gave them a motive for fabricating a story for the grand jury.

 While it is true that no explicit reference to the pending grand jury investigation was made during the taped conversations,[10] we have previously held that circumstantial evidence is sufficient to uphold an obstruction of justice charge. United States v. Bufalino, 285 F.2d 408 (2d Cir. 1960). Here the evidence showed that defendants arranged the meeting, took the active role in fabricating a story about the two horses, and knew that a federal grand jury was investigating the ownership of the horses. Since the evidence established motives for the defendants to concoct the cover story, the jury could properly infer that defendants' object was to obstruct the grand jury proceedings in violation of 18 U.S.C. § 1503.[11]

 Finally defendants suggest that there was no evidence establishing a conspiracy. It is well established that a jury can infer an agreement to violate a law from circumstantial evidence. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). Once the jury determined that Gerry and Trucotte were guilty of obstructing justice, they could infer that they had agreed to do so from the facts that they arrived together at Kraft's farm and both participated in the formulation of the cover story.

## II

Turcotte also argues that the trial court erred in denying his motion to have his trial severed from that of Gerry. He suggests that Gerry's notoriety as a recently convicted race fixer would lead the jury to impute Gerry's wrongdoings to him.

 Turcotte's claims of prejudice are unpersuasive. Any possible juror prejudice against Gerry or Turcotte as a result of publicity from the recent race-fixing trial could be (and presumably was) prevented by careful examination of prospective jurors by defense counsel prior to the impanelment of the jury to determine if they had been exposed to any publicity concerning the race-fixing trial. Moreover, this was a relatively simple case and Turcotte was significantly involved in each count of the indictment. While it is true that a limited overview of Gerry's role in a superfecta betting scheme came out at the trial, it was necessary in order to provide the jury with the background against which this case arose. Since the trial judge specially instructed the jury that it was not to consider any evidence regarding the superfecta betting scheme when it deliberated on Turcotte's guilt or innocence, Turcotte was not prejudiced by this joint trial.

 The trial judge is normally afforded wide discretion in deciding whether to order a severance. 1 C. Wright, Federal Practice & Procedure—Criminal § 227 (1969). That discretion

---

**10.** The taped conversations did contain some references to grand jury investigations. For example, Gerry explained to Kraft at their August 4th meeting that he had learned a lot from his involvement in a 1966 grand jury investigation into twin-doubles betting when he said he went through the same problems as he was now having with the superfectas. (What he learned was not to have the people involved in a betting scheme associate with each other in public lest the grand jury "put it to them" by questioning them about such meetings.)

**11.** Turcotte argues that the trial judge erred in failing to grant his motion to dismiss the ob-

struction of justice count because of improper venue. While it is true that Turcotte's part in the obstruction of justice occurred in New Jersey, trial in the Eastern District was permissible because Turcotte waived any objection he had to venue when his counsel withdrew the motion to dismiss for improper venue prior to trial. United States v. Price, 447 F.2d 23, 26–28 (2d Cir.), cert. denied, 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971); United States v. Rivera, 388 F.2d 545 (2d Cir.), cert. denied, 392 U.S. 937, 88 S.Ct. 2308, 20 L.Ed.2d 1396 (1968). See generally C. Wright, Federal Practice & Procedure—Criminal § 306 (1969).

was not abused in this case. Compare United States v. Branker, 395 F.2d 881 (2d Cir. 1968), cert. denied, 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969); United States v. Bozza, 365 F.2d 206 (2d Cir. 1966).[12]

### III

█ Turcotte and Gerry next argue that the trial court so abused its discretion in restricting their cross-examination of Kraft that their convictions should be reversed. Four instances are given of such alleged improper curtailment of cross-examination: First, they were not allowed to question Kraft about a 1960 felony conviction in New Jersey for atrocious assault and battery. Since the conviction was 14 years old and did not relate to Kraft's truthfulness, the trial court did not abuse its discretion when it did not allow cross-examination about that conviction. See United States v. Owens, 263 F.2d 720, 722 (2d Cir. 1959); Fed.R.Ev. 609 (effective July 1, 1975).

█ Second, the defendants argue that it was improper for the trial court to prohibit them from asking Kraft whether he had been denied his request for immunity and whether he had told Gerry that he had been denied immunity. The record discloses that the first question was asked and answered in the presence of the jury. While the second question was asked and answered outside the jury's presence, the trial court never ruled that it could not be asked in the jury's presence. What the trial court did not permit was a series of questions that assumed that Kraft had legal knowledge about immunity that he claimed he did not have.

12. Turcotte also objects now (but he did not at trial) to two isolated portions of the trial court's charge to the jury. The first portion of the charge to which Turcotte objects, dealing with his relationship to race-fixing, is taken out of context. The succeeding portion of the charge made it clear that the jury was not to consider evidence of race-fixing in determining Turcotte's guilt or innocence.

Turcotte also suggests that it was error for the trial judge to tell the jury that they could

Finally, defendants complain of two occasions when the trial judge limited the scope of their cross-examination of Kraft concerning his motives to testify falsely in favor of the government. Defendants are usually afforded considerable latitude in exploring such motives in their cross-examination of the principal government witnesses against them. Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953); United States v. Miles, 480 F.2d 1215 (2d Cir. 1973).

Here defendants object to the trial court's refusal to allow them to question Kraft about a New Jersey criminal charge of receiving stolen property then pending against him and its refusal to allow them to examine Kraft on whether he had requested to be sentenced on his sports-bribery conviction prior to their trial. While Kraft was asked the latter question, he replied that he didn't know how to answer it and the trial court later refused to let the defendants inquire further into this matter unless they produced some record document that established that such a request had been made.

█ The trial court, of course, has discretion in deciding how far defendants can go with such cross-examination. If the jury is otherwise in possession of sufficient information concerning the witness' possible motives for testifying falsely in favor of the government, there is no abuse of discretion if a judge restricts the cross-examination of a government witness. United States v. Miles, *supra;* United States v. Blackwood, 456 F.2d 526, 530–31 (2d Cir.), cert. denied, 409 U.S. 863, 93 S.Ct. 154, 34 L.Ed.2d 110 (1972).

infer that Turcotte knew his statement was false if it was in fact false. We disagree. See United States v. Sweig, 441 F.2d 114, 117 (2d Cir.), cert. denied, 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). In any event, the judge told the jury that "[i]f after hearing all of the testimony, you have a reasonable doubt in your mind as to whether or not the defendant, Elden Turcotte, believed the declarations made by him were true, then you must resolve that doubt in his favor and find him Not Guilty." The trial court's charge was proper.

▮ While we think that the trial court should have permitted further questioning about these matters, we ·do not see how the defendants could have been seriously prejudiced by the court's restrictions.

The trial court did permit defendants to ask Kraft if his testimony was motivated by any promises by the government (which would include a promise to intercede with the New Jersey authorities). In addition, the jury was well aware of the fact that Kraft had already pleaded guilty to a sports-bribery charge on which he had not been sentenced and it could infer from this that Kraft expected leniency because of his cooperation with the government. The trial judge also allowed extensive cross-examination of Kraft as to statements he made which indicated he expected leniency from the government. See Transcript at 589–610.

### IV

Lastly, Gerry argues that the trial court permitted too broad a cross-examination of him when he took the stand in his own defense. He points to three specific instances.

▮ First, Gerry claims he was prejudiced by certain questions that the trial judge permitted the government to ask concerning Gerry's girl friend, Connie Rogers.[13] Gerry was asked if he knew that she had been called before the grand jury and that she had been subsequently arrested for cashing superfecta tickets under a false name. He was also asked whether that arrest had resulted in conviction, but an objection to that question was sustained. The first two questions were permissible—they were asked in an effort to establish that Gerry knew of the grand jury's existence and that its investigation concerned betting on the superfectas. The last question was improper and the trial judge correctly sustained the objection. Gerry's knowledge of Ms. Roger's conviction was in no way related to whether he knew the grand jury was investigating the harness racing industry. If anything· it can be viewed as an attempt by the government to suggest Gerry associated with law-breakers.

▮ Second, Gerry claims that the trial judge gave the government too much freedom in cross-examining him concerning his superfecta betting. Since Gerry was accused of trying to influence Kraft's testimony with regard to superfecta betting, we think it was proper for the trial judge to allow the government briefly to question Gerry about the scope of his involvement and his betting, especially since the subject had been brought up during the direct examination by Turcotte's lawyer. It had also been discussed by Kraft in testimony elicited both by defendants and the government. The government's inquiries did not indicate that the betting scheme was illegal and the trial judge repeatedly stressed that neither defendant was accused of race-fixing. Thus, Gerry was not prejudiced by the cross-examination concerning the superfectas.

▮ Finally, Gerry objects to having been asked if he had been accused of race-fixing in 1966. Although an objection was sustained by the trial judge, Gerry denied that he had been so accused. Government counsel should not have asked this obviously improper question. While the trial judge can, and did in this case, sustain objections to such improper questions, the jury is left with the impression that the answer to the questions must be yes. However, we do not feel that this conduct merits reversal here, especially in light of the substantial evidence against Gerry.

Affirmed.

---

13. The government did not ask whether Ms. Rogers was Gerry's girl friend; that information was volunteered by Gerry when he was asked if he knew Ms. Rogers.