UNITED STATES of America, Appellee,

v.

**Richard Victor WARDY, Harvey Foulks, Defendants-Appellants.**

Nos. 147, 64, Dockets 85–1105, 85–1110.

United States Court of Appeals, Second Circuit.

Argued Sept. 4, 1985.

Decided Nov. 20, 1985.

Nanette Dembitz, New York City, for defendant-appellant Richard Victor Wardy.

Gary E. Divis, New York City (David H. Gendelman, New York City, of counsel), for defendant-appellant Harvey Foulks.

Anne T. Vitale, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Stuart E. Abrams, Asst. U.S. Atty., of counsel), for appellee.

Before FRIENDLY, PIERCE and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

Defendants appeal from judgments of conviction entered after a jury trial in the United States District Court for the Southern District of New York, Robert J. Ward, *Judge.* Both defendants appeal from their convictions for conspiracy to retaliate against a witness. Defendant Wardy also appeals from his conviction for aiding and abetting retaliation against a government witness, and for aiding and abetting armed bank robbery. We reject all of their claims except their challenge to the sufficiency of the evidence to support their convictions for conspiracy to retaliate against a witness. Finding insufficient evidence of a conspiratorial agreement, we reverse on that count, but affirm as to the other convictions.

## BACKGROUND

Richard Wardy and Harvey Foulks were close friends. In early June 1984, while visiting Foulks and Foulks's girlfriend, Sally Denise Fauntleroy, at their apartment, Wardy told Foulks he intended to rob Barclays Bank, that the robbery was an inside job, and that it involved a payroll. Foulks apparently agreed to help with the scheme.

Another friend of Wardy's, Harold Keith Burton, had a half-brother, James Taylor, who worked as a security guard at Barclays Bank on Water Street in Manhattan. Taylor was familiar with Barclays' practice of transferring cash for payroll checks from the Water Street office to other branches on the 15th and at the end of each month. He knew that on these days a teller carried a bag containing thousands of dollars in cash through the vestibule of the bank into a waiting taxi.

Wardy reviewed the preparations for the robbery with three men on the evening of June 14, 1984 at a meeting that took place in Burton's Cadillac. The government contended at trial that one of the men was Burton.

At approximately 3:00 a.m. on June 15, 1984, the day of the robbery, Wardy hailed a gypsy cab. A short time later, Wardy pulled out his .45 caliber automatic pistol, and told the driver that he needed to borrow the cab for five hours. When the driver protested, Wardy told him to write the name "Peaches" and a phone number on a piece of paper. Peaches is the nickname for Wardy's friend Lydia Romero. He also told the cab driver to write his own name and address on the same piece of paper. The driver tore the piece of paper in half and gave Wardy the portion with the driver's name and address, keeping for himself Peaches' name and phone number. Wardy then ordered the driver out of the cab and drove off.

Shortly before 9:30 a.m. on June 15, two men drove the stolen gypsy cab to the vicinity of Barclays Bank. After parking the cab, they entered the bank and sat in the vestibule, pretending to deliver coffee to a bank employee. While they were waiting, an unarmed bank security guard, assigned to escort a teller carrying approximately $46,000 of payroll money to another branch of the bank, walked through the vestibule to hail a cab. Once he had done so, he returned to the vestibule and met the teller in the lobby. He then escorted her through the lobby to the vestibule.

As the guard started to open the outer door leading from the vestibule to the street, one of the robbers struck him on the head with a gun, spun the guard around, struck him again with the gun, and then ordered him to get behind the door. At that point, the guard noticed a black revolver in the robber's hand. The man ordered the guard to put his hands up and then struck him again on the head. The other robber grabbed the money bag from the teller, and both men fled from the bank to the gypsy cab.

By 10:00 a.m. they had abandoned the cab on the FDR Drive. Police officers located the cab shortly thereafter; two fingerprints from the inside front window were later identified as Wardy's.

Sometime later that day, Wardy, in the company of another man, arrived at Romero's apartment carrying a black .38 revolver and a brown paper bag containing mon-

ey in $20 and $50 denominations. While Wardy was there, the driver of the gypsy cab called; Wardy told him that his cab was on the FDR Drive. Foulks also stopped by the apartment while Wardy was still there.

The name and phone number Wardy had given the cab driver led police to Romero. The information she had provided about Wardy's role in the robbery led to his arrest on June 28. At the time of his arrest Wardy was standing near his car, in which the police found an unloaded black .38 revolver and a slip of paper bearing the cab driver's name and address.

After his arrest, Wardy was remanded in lieu of bail, and remained in custody throughout his trial, conviction, and sentence. While in custody, he phoned Foulks's residence. Although Foulks was not at home, Wardy told Foulks's girlfriend, Fauntleroy, that "Peaches squealed" on him and that he "wanted Harvey to take care of Peaches". In September 1984 Wardy mailed Foulks a copy of an affidavit filed in support of a search warrant for Wardy's car. The affidavit identified Romero as a source of information against Wardy. Wardy attached a note to the affidavit stating something to the effect of "see how your girl is." Foulks showed the papers to two of his friends, stating to one that the papers proved that Romero was responsible for putting Wardy in jail.

On the night of September 22, 1984, Romero was working as a dancer at a nightclub. A coworker, Shirlee Robinson, saw Romero in the ladies room and told her that Foulks had said to tell Romero that he had proof that she had put his friend in jail and that he wanted to talk to her. Romero told Robinson that she didn't have anything to say to Foulks.

Romero then left the ladies room and began to dance on stage. Foulks climbed on the stage and began hitting Romero, saying "your ass is mine", and telling her that "everybody in [her] family was going to die [she] and [her] kids" because she had "squealed" on Wardy and put him in jail.

Patrons and other employees eventually separated Foulks and Romero, and took Foulks outside. Romero later went to the hospital and was released after treatment for her injuries.

A grand jury issued a seven-count indictment against Wardy, Foulks, and their co-defendants Burton and Taylor. Count 1 charged all four with conspiring to participate in the robbery in violation of 18 U.S.C. § 371; count 2 charged Wardy, Burton, and Taylor with bank robbery in violation of 18 U.S.C. § 2113(a); count 3 charged Wardy and Burton with assaulting persons and placing their lives in jeopardy, by use of a dangerous weapon or device, during the course of a robbery, in violation of 18 U.S.C. § 2113(d); count 4 charged Foulks with receiving the proceeds of the bank robbery in violation of 18 U.S.C. § 2113(c); count 5 charged Wardy and Foulks with conspiring to retaliate against a witness, in violation of 18 U.S.C. § 371; and count 6 charged Wardy and Foulks with retaliating against a witness, in violation of 18 U.S.C. § 1513. Only three of these counts, counts 3, 5, and 6, are relevant on this appeal. Following trial, the jury returned guilty verdicts against Wardy and Foulks on all counts charged. Judge Ward declared a mistrial as to Burton and Taylor about whom the jury was unable to reach a verdict.

Judge Ward sentenced Wardy to concurrent terms of imprisonment of 5 years and 20 years on counts 1 and 3, respectively; additionally, he sentenced Wardy to consecutive terms of 5 years and 10 years on counts 5 and 6, respectively. The sentences on counts 5 and 6 were consecutive to the sentences on counts 1 and 3. Thus, Wardy received a total of 35 years' imprisonment.

Judge Ward sentenced Foulks to concurrent 5 and 10 year terms on counts 1 and 4, respectively, and 5 and 10 year terms on counts 5 and 6, respectively, consecutive to each other and to the sentences imposed on counts 1 and 4. Thus, Foulks received a total of 25 years' imprisonment.

Wardy appeals from his conviction on count 3 on several grounds; he also appeals from his conviction on count 6 on the ground of insufficient evidence to support the jury's verdict. Both defendants challenge the sufficiency of the evidence to support their convictions on count 5.

## DISCUSSION

### A. *The Armed Bank Robbery Conviction.*

Wardy raises several arguments to support his claim that his conviction on count 3 of armed bank robbery under § 2113(d) is invalid. First, he argues that the "use" of the revolver during the bank robbery does not satisfy § 2113(d)'s requirement of "use of a dangerous weapon".

Section 2113(d) provides that whoever while committing a bank robbery "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both." 18 U.S.C. § 2113(d). Wardy argues that the robber who brought the gun into the bank did not point it, brandish it, or display it threateningly, but merely carried the gun visibly, and reasons that § 2113(d) should not be construed to encompass such "mere carriage".

This distinction has merit. For example, if the police apprehended a bank robber during the course of a robbery and subsequently discovered that he had carried a gun concealed in his belt or in a shoulder holster, a conviction under § 2113(d) would probably be unwarranted. But that is not the situation before us. When the guard entered the vestibule, the robber struck him on the head with the gun, spun him around, hit him a second time and ordered him to get behind the door. At this point the guard saw the revolver in the robber's hand. The robber then ordered him to put his hands up and hit him a third time. In the guard's own words, the robber "threatened me to get behind the door".

Without resolving whether the use of a gun as a bludgeon—absent other circumstances present here—constitutes the use of a dangerous weapon within the scope of § 2113(d), the facts still support Wardy's conviction. When a bank robber carries a gun visibly, strikes a guard with it, and orders the guard to put up his hands and get behind a door, there is an implicit threat that he will shoot if his orders are not complied with. *See United States v. Marshall,* 427 F.2d 434, 437 (2d Cir.1970). Only a foolhardy individual would believe he could ignore such commands with impunity. Indeed, the robber would simply belabor the obvious were he to add the words "obey my orders or I will shoot".

Under these circumstances, the jury was entitled to find that the robber assaulted the guard by the use of a dangerous weapon. *See United States v. Oliver,* 523 F.2d 253, 259–60 (2d Cir.1975) (evidence sufficient to find assault under § 2113(d) where a bank robber used a handgun to force his way into the bank and to direct employees to place the money in his case). Alternatively, the jury was entitled to find that the robber placed the guard's life in jeopardy by the use of a dangerous weapon. *See United States v. Tarricone,* 242 F.2d 555, 557 (2d Cir.1957) (evidence sufficient to support conviction under § 2113(d) for putting the life of a teller in jeopardy where robber showed the teller his gun and told her to keep quiet and hand over the money).

Wardy also contends that the evidence fails to support the inference that the gun was loaded. In *Marshall* we held that a jury may infer that a gun used during a robbery was loaded in the absence of direct proof that the chamber contained bullets. 427 F.2d at 437. We noted that the act of threatening others with a gun is tantamount to saying that the gun is loaded. Moreover, we noted that the use of an unloaded gun would be a hazardous venture for a bank robber should armed guards or police interrupt the venture. *Id.*

Wardy argues that such an inference is improper in this case by reasoning that: (1)

the gun was not used to threaten anyone; (2) since the robbery was partly an inside job, the robbers must have known that the bank had stopped using armed guards; and (3) since the robbery was planned to take only a moment from its start to the robbers' exit, there was little chance of police interruption.

Despite Wardy's protestations to the contrary, however, the jury could infer that the visible presence of the gun under these circumstances constituted a threat to use it; from that threat, the jury was entitled to infer that the gun was loaded. Moreover, even assuming that the robbers did know that the bank had stopped using armed guards, and that the robbery would take only a moment, there was always the possibility that passing police would notice two men running from the vestibule of a bank, especially if they were pursued by a uniformed guard. The possession of an unloaded gun in that event would surely place the robbers in jeopardy of coming under fire by the police, and we find it "unlikely that a bank robber who purports to be armed would undertake this risk". *Id.*

The jury was free to credit or reject the inference that the gun was loaded. Allowing a jury to make such a permissive inference is improper only in a situation where there is no rational way the jury could make the connection permitted by the inference. *County Court of Ulster County v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979). Under the circumstances here, we hold that the inference was justified.

Wardy next argues that there is insufficient evidence that he intended a loaded gun to be used in the robbery and that he therefore could not be convicted as an aider and abettor.

We think the evidence was sufficient for the jury to infer not only that the gun used in the robbery belonged to Wardy, but also that Wardy intended it to be used. The guard testified that he was struck on the head with a black revolver during the robbery. Wardy appeared at Romero's apartment after the robbery on June 15 with a black .38 caliber revolver. When Wardy was arrested on June 27, the police retrieved a black .38 caliber revolver from his car. Moreover, in view of the evidence that Wardy had met with his coconspirators to discuss plans for the robbery on the night before it actually took place, the jury could reasonably infer that he had furnished the gun for the robbery, and that he anticipated it would be used in the manner that it was. Drawing all favorable inferences in favor of the jury's verdict, as we must, *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985), there was sufficient evidence to support Wardy's conviction as an aider and abettor. *See United States v. Short,* 493 F.2d 1170, 1172 (9th Cir.) (to be convicted as an aider and abettor under § 2113(d), the jury must find that the defendant knew that the bank robber would be armed and intended to use the weapon, and that the defendant intended to aid the robber in that aspect), *cert. denied,* 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974).

Finally, Wardy raises three claims of error in the jury charge. However, by failing to object in the district court, where he was represented by other counsel, he waived all objections short of plain error. Fed.R.Crim.P. 52(b). Even if one or more of the instructions were considered to be erroneous, none of them rises to the level of plain error.

## B. *Witness Retaliation.*

Wardy contends that there was insufficient evidence to support his conviction for aiding and abetting Foulks's beating of Lydia Romero. He argues that he "clearly did not have or exert control over Foulks" and that even if Wardy's remarks to Fauntleroy partially motivated Foulks's beating of Romero, it would be a "strange and very dangerous doctrine" to hold that a "person's expression of a wish makes him a principal in a crime".

To the contrary, we see nothing strange or dangerous here. Wardy called his close friend, Foulks. When Foulks wasn't home,

Wardy told Foulks's girlfriend, Fauntleroy, that Romero had squealed and that he wanted Foulks to take care of her. He later documented his assertion that Peaches squealed by mailing the affidavit to Foulks. Even though Fauntleroy couldn't recall that she had informed Foulks of that part of the message where Wardy wanted Foulks to "take care" of Romero, the jury was properly entitled to infer that she had passed the message on and that Wardy had intended for her to pass it on. What this boils down to, then, is a request through an intermediary for Foulks to retaliate against a witness for her statements to the police, supported by documentation that the witness had made these statements.

Under 18 U.S.C. § 2(a), whoever "aids, abets, counsels, commands, induces, or procures [the] commission" of an offense is punishable as a principal. To be punishable as a principal offender under § 2(a) a defendant need not know all the details of the crime. *United States v. DeFiore*, 720 F.2d 757, 763 (2d Cir.1983), *cert. denied, Coppola v. United States*, 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984). All that is required is that the defendant " 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' " *United States v. Perry*, 643 F.2d 38, 46 (2d Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). Wardy's actions meet this test. Indeed, given his status as a prisoner when he learned about Romero's role, there was little more he could have done to bring about the retaliation. In any event, taking the view most favorable to the government, there was sufficient evidence to support the jury's verdict finding Wardy guilty under § 2(a), and Wardy has failed to overcome the heavy burden of showing otherwise. *Young*, 745 F.2d at 762.

We find more merit in appellants' contention that the evidence was insufficient to support their convictions for conspiracy to retaliate against a witness.

"Conspiracy requires proof of 'preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting.' " *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir.1983), *cert. denied*, 465 U.S. 1028, 104 S.Ct. 1289, 79 L.Ed.2d 691 (1984) (quoting *United States v. Peterson*, 524 F.2d 167, 174 (4th Cir. 1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976)). The gist of every conspiracy is an unlawful agreement. *United States v. Barnes*, 604 F.2d 121, 154 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). We have recognized that conspiracy by its very nature is a secretive operation, *United States v. Tyler*, 758 F.2d 66, 68 (2d Cir. 1985), and that the jury can infer an agreement from circumstantial evidence, *United States v. Turcotte*, 515 F.2d 145, 150 (2d Cir.), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975). But, however slight or circumstantial, the evidence must tend to prove that the appellants did enter into some form of agreement. *United States v. Kates*, 508 F.2d 308, 310 (3d Cir. 1975). This does not require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct. *See United States v. Swarek*, 656 F.2d 331, 336 (8th Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981).

Such evidence is lacking here, however. Certainly, there is no showing of any formal or express agreement to retaliate against Romero. Wardy simply passed along the message to Foulks to take care of Romero and Foulks did so. Nor is there any evidence of a past course of retaliation against witnesses from which the jury could infer the existence of a tacit understanding between Foulks and Wardy that they would deal with "squealers" in this manner. *See United States v. Beachner Construction Co.*, 729 F.2d 1278, 1283 (10th Cir.1984); *United States v. Consolidated Packaging Corp.*, 575 F.2d 117, 126 (7th Cir.1978).

Undoubtedly, Wardy hoped that his close friend, Foulks, would do something when

he received the message through Fauntleroy; indeed, in view of their friendship, he might have expected such action. He attempted to prod Foulks along by mailing him evidence of Romero's complicity, and, in effect, by complaining about her again. For these actions he stands convicted under § 2(a) of inducing witness retaliation. Similarly, for the beating, Foulks stands convicted of the retaliation itself. But those facts do not establish a conspiracy, for there is no evidence from which the jury could rationally infer that Foulks and Wardy reached an agreement that Romero was to be beaten. Absent any such evidence, both conspiracy convictions fail.

## CONCLUSION

With the exception of the convictions for conspiracy to retaliate against a witness, the convictions are affirmed. Both appellants' convictions on the conspiracy to retaliate count are reversed, and the sentences imposed thereon are vacated.