UNITED STATES of America, Appellee,

v.

Richard L. RUBIN,
Defendant–Appellant.

No. 421, Docket 87–1190.

United States Court of Appeals,
Second Circuit.

Argued Dec. 16, 1987.

Decided April 15, 1988.

Emily Berger, Asst. U.S. Atty., Brooklyn, N.Y. (Andrew J. Maloney, U.S. Atty., for the E.D.N.Y., John Gleeson, Asst. U.S.

Atty., Brooklyn, N.Y., on the brief), for appellee.

Gavin W. Scotti, New York City, for defendant-appellant.

Before KAUFMAN, MESKILL, and KEARSE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Richard L. Rubin, an attorney who was involved in New York State ("State") lawmaking and politics, appeals from a judgment entered in the United States District Court for the Eastern District of New York, after a jury trial before Jack B. Weinstein, *Chief Judge*, convicting him on one count of conspiracy to commit mail fraud and one count of conspiracy to cause the filing of false income tax returns, both in violation of 18 U.S.C. § 371 (1982); six counts of mail fraud, in violation of 18 U.S.C. § 1341 (1982); and two counts of causing the filing of false income tax returns, in violation of 26 U.S.C. § 7206(2) (1982). Rubin was sentenced to five-year prison terms on each of the conspiracy counts and on five of the six mail fraud counts, and to three-year prison terms on each of the income tax counts, all terms to be served concurrently. On the remaining mail fraud count he was given a suspended five-year sentence and placed on probation for five years, to begin after the conclusion of his prison term and parole, with the condition that he have nothing to do with law or legislation during his probationary term. In addition, Rubin was ordered to make restitution in the amount of $33,-468.07, to pay a $380,000 fine, *see* 18 U.S.C. § 3623(a) (Supp.III 1985), and to pay mandatory assessments totalling $500. He is free on bail pending appeal.

On appeal, Rubin contends that the acts charged do not fall within the purview of the mail fraud statute, and that the evidence was insufficient to support his conviction on any count. We disagree and affirm the judgment of conviction.

## I. BACKGROUND

During the period in question, Rubin, an attorney who maintained a private law practice in Queens County, New York, was also a special counsel to the Speaker of the New York State Assembly ("Assembly") and was Executive Secretary to the Executive Committee of the Queens Democratic Organization ("QDO"). All of the offenses of which Rubin was convicted related to the salaries of Marilyn Wagner, his law office secretary from 1980 to 1982, and Mary Robles, his law office secretary from 1982 to 1986. Their salaries derived from three sources: the Assembly, the QDO, and Rubin personally.

The government contended that Rubin fraudulently caused the use of State funds to pay the major part of the salaries received by his secretaries although they did almost no work for the Assembly, and that by reason of the mailing of Assembly checks to pay these salaries, Rubin was guilty of mail fraud and conspiracy to commit mail fraud. Most of the rest of the salaries of Wagner and Robles came from the QDO, and the government contended that Rubin had advised them not to report the QDO payments as income, thereby causing the filing of false income tax returns. As a result of the use of State funds and the ostensibly tax-free QDO funds, Rubin was able to have full-time secretarial help for his private law practice at a cost to himself of just $3,500 to $4,000 per year.

The government's case was presented principally through the testimony of Wagner, Robles, and Assembly members David Cohen and Gerdi Lipshutz, all of whom testified pursuant to grants of immunity. Taken in the light most favorable to the government, the evidence was as follows.

### A. *The Assembly's Secretarial Staff Arrangements*

The Assembly provided Rubin with a secretary in Albany, New York, who worked during the Assembly session, which ran from January until June, and with occasional help from an Assembly secretarial pool maintained in Manhattan. Rubin had neither the budget nor the authority to hire additional secretarial help.

Members of the Assembly had budgets to hire office staff and staff for committees on which they had leadership positions. With the approval of the Assembly Speaker or his chief administrative aide, members could obtain budget increases for the hiring of additional staff. Though there were no ceilings on or guidelines governing such increases, there were safeguards designed to ensure that employees placed on a member's payroll actually worked for the Assembly. The employee was required annually to fill out an application for employment and to sign a Certificate of Continuing Performance of Duties ("Continuing Performance") stating that the employee was providing the services of the position. The Assembly member was required to fill out an annual Personnel Action Request for each employee as well as a biweekly Personnel Service Voucher certifying that the employee was working in the appropriate position; only after receipt of the latter form was the employee's paycheck released.

## B. Wagner's Salary Arrangements and Responsibilities

Wagner testified that she was hired by Rubin in mid–1980 to be the secretary in his law office. He told her that when the Assembly went into session in 1981, she would be placed on its payroll. Either in the job interview or soon after she was hired, Rubin assured her that, although her total salary would be somewhat less than her salary in her previous position, her total take-home pay would be higher because the portion of her salary that came from the QDO would not be taxed.

In January 1981, Wagner was placed on the Assembly payroll as an employee of Assemblyman Cohen, an attorney and personal friend of Rubin with whom Rubin shared, *inter alia*, clients, business ventures, and an apartment. Rubin obtained an Assembly budget increase for Cohen to cover Wagner's salary; Cohen submitted Personnel Action forms stating that Wagner was on his office staff and signed Personnel Service Vouchers every two weeks indicating that Wagner was performing the work of an administrative aide

in 1981 and a junior administrative assistant in 1982. Wagner submitted employment applications in 1981 and 1982, and signed certificates of Continuing Performance, representing that she was actually working on Cohen's staff during those years.

In fact, Wagner did virtually no work for Cohen. Cohen stated that Wagner worked for him a few times; she testified that she worked for him only once. Nor did Wagner spend any significant amount of time on Assembly matters for Rubin. Rather, she estimated that she spent about 80% of her time doing paralegal-type work on guardianships and conservatorships held by Rubin. Nearly all the rest of her time was spent on QDO matters. Only about 1% of her time was spent on Assembly matters, principally taking and relaying telephone messages.

In 1981, Wagner was paid a total salary of $16,300; of this amount, $7,500 was paid by the Assembly. She worked for Rubin until October 1982. In 1982, her annual salary level was $17,700, of which the Assembly was to pay approximately $9,000. Her Assembly paychecks were mailed from Albany to Cohen's office in Queens.

In those years, Wagner also received, respectively, $5,300 and $4,100 from the QDO. Relying on Rubin's 1980 representations to her, she did not report these amounts on her income tax returns. Those returns were prepared for her by Rubin's accountant, without charge to Wagner.

## C. Robles's Salary Arrangements and Responsibilities

When Wagner left Rubin's employ in October 1982, she was replaced by Robles. In Robles's job interview, Rubin informed her that she would be put on the Assembly payroll. He also assured her that she would earn more working with him than she had in her previous job, though it might not appear to be so, because part of her salary would be off-the-books payments from the QDO and would not be taxable.

Initially, Robles replaced Wagner on Cohen's Assembly payroll, and Cohen provided the same type of documentation for Robles that he had for Wagner. Cohen was defeated for reelection in the 1982 Democratic primary, however, and Rubin got Assembly member Lipshutz to place Robles on her payroll beginning in 1983; he secured for Lipshutz a budget increase to cover Robles's salary. Lipshutz filed documentation indicating that Robles worked in 1983 for the Assembly Steering Committee and in 1984–86 for the Assembly Subcommittee on Casino Gambling; Lipshutz also signed the biweekly Personnel Service Vouchers for Robles indicating that she was performing her duties.

In fact, Robles did no work at all for Cohen and none for Lipshutz prior to 1986, when political events and public attention prompted Rubin and Lipshutz to alter their arrangements. Prior to the change, Robles spent most of her time managing Rubin's law office and doing paralegal-type work on his guardianships and conservatorships, and most of the remainder of her time doing QDO work. She estimated that only 2% of her time was spent on Assembly work.

In the meantime, the Assembly was paying approximately half her salary. In 1983, 1984, and 1985, for example, Robles's total salary ranged from approximately $18,000 to $20,000. In those years the amounts paid by the Assembly were approximately $9,000, $10,000, and $9,500, respectively. Robles's pay checks were mailed from Albany to Lipshutz's district office; at Rubin's instruction, Lipshutz's administrative assistant mailed the checks to Rubin's office in plain, non-Assembly envelopes. All other checks were mailed from Lipshutz's office in Assembly envelopes.

During these years, Robles received approximately $5,000 to $6,000 per year from the QDO. Because Rubin had told her she would not have to report the QDO payments as income, Robles was surprised that the payments were made by check rather than in cash. She asked Rubin to clarify the tax status of these payments;

he told her the money was nontaxable because it was "political funds" and that she would not receive an IRS W–2 or 1099 form. In 1983, when she was preparing her 1982 tax returns, Robles again raised the subject with Rubin, who emphasized, with a show of anger and annoyance, that Robles was not required to declare those payments as income. Rubin offered to have his accountant prepare Robles's returns as he had done for Wagner, but Robles declined. Robles did not report on her 1982, 1983, and 1984 income tax returns the amounts she received from QDO; she reported some, but not all, of the amount she received in 1985.

In early 1986, as allegations of political corruption in Queens began attracting public attention, a news article identified Robles as a "no-show" Assembly employee who actually served as Rubin's private secretary. Accordingly, Rubin instructed Robles that she would have to work for Lipshutz, and she began to spend two-to-three hours, two or three days a week, at Lipshutz's office. Rubin promptly complained that Lipshutz was giving Robles too much work.

When investigators began to question Robles, she became nervous, notwithstanding Rubin's reassurances that she should not worry because she was now working for Lipshutz and that she could cure any problem related to QDO by paying her back taxes on the amounts previously undeclared. In June 1986, Robles resigned from her jobs with Rubin and the Assembly.

D. *The Defense Case*

Rubin's defense theory was that it was not improper for the Assembly to pay part of the salaries of Wagner and Robles because they did Assembly work, and it was common and permissible for Assembly employees to do Assembly work for someone other than the member on whose payroll they were listed. He sought to establish this theory in part through the testimony of Assembly members who testified to this common practice and of several Assembly employees who testified that they frequent-

ly called Rubin's office in Queens with important messages and that they sent numerous reports and other correspondence to that office.

Rubin cross-examined Wagner and Robles to demonstrate that they performed substantial Assembly-related telephone work. He also sought to show that Wagner's memory was vague with respect to the conversation in which Rubin purportedly told her not to report the QDO payments, and that Robles's direct testimony overstated the number of guardianships and conservatorships she had worked on for Rubin. It was also brought out that Wagner and Robles had failed to report certain income other than the QDO income on their tax returns or had fraudulently overstated certain deductions.

### E. The Verdict

The jury found Rubin guilty on six counts of mail fraud, relating to the mailing of paychecks to Wagner in 1981 and 1982 and to Robles in 1982, 1983, 1984, and 1985; on two counts of causing Wagner to file false income tax returns; on one count of conspiring to commit mail fraud; and on one count of conspiring to file false income tax returns. It acquitted him on one count of mail fraud with respect to the mailing of paychecks to Robles in 1986 and acquitted him on all counts alleging that he caused Robles to file false tax returns. Rubin was sentenced as indicated above.

## II. DISCUSSION

On appeal, Rubin contends principally that (1) the evidence was insufficient to support the jury's verdict on each of the counts for which he was convicted, and (2) the district court did not have jurisdiction over the mail fraud counts because the conduct alleged did not fall within the scope of 18 U.S.C. § 1341 as interpreted by the Supreme Court in *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). We find these arguments to be without merit.

### A. Sufficiency of the Evidence

In challenging the sufficiency of the evidence to convict him, a defendant bears a heavy burden. *United States v. Sumnicht,* 823 F.2d 13, 15 (2d Cir.1987); *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing such a challenge, we must view the evidence in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), drawing all possible inferences in the government's favor, *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983), and "defer[ring] to the jury's resolution of the weight of the evidence and the credibility of the witnesses," *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). We "will not second-guess a jury's finding on credibility." *United States v. Stratton,* 779 F.2d 820, 828 (2d Cir.1985), *cert. denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986); *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1972). We must uphold the conviction if, from all inferences reasonably drawn, " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Resto,* 824 F.2d 210, 212 (2d Cir.1987) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)). In light of these principles, Rubin has failed to carry his burden.

### 1. Mail Fraud and Mail Fraud Conspiracy

In challenging the sufficiency of the evidence to convict him of mail fraud and conspiracy to commit mail fraud, Rubin argues that there was no evidence of a conspiracy and no evidence that Wagner and Robles were precluded from doing Assembly work. His first argument is untenable; his second misconceives the charges against him.

The fundamental element of a conspiracy is unlawful agreement. *United*

*States v. Wardy,* 777 F.2d 101, 107 (2d Cir.1985), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986); *United States v. Barnes,* 604 F.2d 121, 154 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). The government's proof of an agreement "does not require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct." *United States v. Wardy,* 777 F.2d at 107; *United States v. Swarek,* 656 F.2d 331, 336 (8th Cir.), *cert. denied,* 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981). Both the existence of the conspiracy and the intent to commit the underlying substantive offenses may be proven by circumstantial evidence. *United States v. Turcotte,* 515 F.2d 145, 150 (2d Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975); *United States v. Barnes,* 604 F.2d at 161–62.

■ Taken in the light most favorable to the government, the evidence adduced at trial supports the conclusion that Rubin had the requisite understanding with others to defraud the State of funds that he used to compensate his secretaries for private law-practice work. The evidence included proof that Cohen and Lipshutz put Wagner and Robles on their payrolls at the behest of Rubin; that Wagner and Robles regularly submitted false certifications that they were performing specified Assembly jobs; that Cohen submitted certificates and vouchers affirming that Wagner and Robles were providing the services called for in the designated positions; that Cohen, at best, never knew whether Wagner (who worked directly across the hall from Cohen's office in Queens) ever did any Assembly work; that Lipshutz submitted certificates and vouchers affirming that Robles was performing work for certain Assembly committees; and that though Lipshutz had complained to Rubin that she felt uncomfortable about making her certifications, she had gone along because Rubin told her she should not complain because the QDO had been "good" to her. Wagner and Robles testified that, notwithstanding their own affirmations of services performed and the certifications provided by the Assembly members, they spent, respectively, only 1% and 2% of their time on Assembly work. Though Rubin argues that their testimony was not credible and that it permitted the inference that Wagner and Robles did sufficient Assembly work that the State was not defrauded of its funds, the decision whether, and to what extent, to believe any of the witnesses lay within the province of the jury, and we will not overturn its evident decision to credit Wagner and Robles. Taking all of the testimony in the light most favorable to the government, we conclude that the evidence was sufficient to permit a rational juror to find beyond a reasonable doubt that Rubin had conspired with Cohen, Lipshutz, Wagner, or Robles, or with all of them, to cause the State to pay substantial sums for non-Assembly work.

■ Finally, Rubin's argument that there was no evidence that he conspired to preclude Wagner and Robles from doing Assembly work misses the mark. Rubin was charged with, and convicted of, having fraudulently obtained State moneys to pay for his private secretaries' performance of his private law work. The government adduced proof that the secretaries received some 50% of their compensation from the State while spending only 1–2% of their time on State matters. It had no obligation to prove that there was any agreement to "preclude" their doing Assembly work.

### 2. Tax Fraud and Tax Fraud Conspiracy

■ Rubin contends that he is entitled to acquittal on the charges of causing the filing of false tax returns by Wagner and of conspiracy to cause the filing of false returns because the only evidence on these counts was the testimony of Wagner, which he argues was vague and was substantially impeached by her admission of her other failure to report income. We disagree with both the suggestion that Wagner's testimony was not credible as a matter of law and the contention there was no other evidence to support these counts.

Wagner's only conversation with Rubin about the tax treatment of the money she would receive from the QDO occurred either in her job interview or soon after she was hired. Though Wagner testified that she did not recall exactly what Rubin said, she testified that Rubin said "[i]n substance" that she would do as well as or better than she had in her previous job, giving her to understand that, though her gross salary might be less or no more than her previous gross salary, her take-home pay would increase. She testified that during this conversation, Rubin wrote out some figures for her with reference to the fact that she would be receiving money from the QDO:

Q What did he say to you in that connection about the figures on that piece of paper?

A He just basically told me that I would be receiving a check from the Democratic Organization.

Q Did he say anything about the tax treatment at that point?

A At that time?

Q Yes.

A My understanding was that, that I would not have to report it for taxes, but I don't—I cannot tell you exactly what he said.

A witness may properly testify to a conversation either by repeating the words used or by describing the substance of the statements. Thus, although the jury was, of course, free to discredit Wagner's testimony, it was not required to do so merely because she could not remember Rubin's exact words. It was free to believe her testimony that, in substance, Rubin advised her not to disclose the QDO income. In addition, despite the jury's failure to convict Rubin of causing Robles to file false returns, it could have accepted Robles's testimony as revealing part of a pattern providing corroboration that Rubin gave Wagner similar advice.

We conclude that the evidence was sufficient to support the tax convictions.

## B. *The Scope of § 1341*

Finally, Rubin argues that the mail fraud counts under 18 U.S.C. § 1341 should be dismissed because they consisted essentially of assertions that he caused members of the Assembly to do unwarranted favors for him and thereby deprived the people of New York of their intangible rights to honest and fair government. He contends that prosecution of this conduct under the mail fraud statute is foreclosed by the Supreme Court's recent decision in *McNally v. United States*, 107 S.Ct. at 2875. We reject his factual premise.

In *McNally*, the Court dealt with the convictions of Kentucky politicians for mail fraud on the basis of their scheme to require an agency that provided insurance to the commonwealth to share its commissions with agencies owned by the defendants. The Court noted that there had been no allegation, and the jury had not been required to find, that the commonwealth had been defrauded of money or property or deprived of control over its property. Holding that § 1341 was designed to protect only property rights, not the citizens' intangible rights to good government, the Court reversed the convictions.

The indictment and proof in the present case are significantly different from those of *McNally*. Here, the indictment charged Rubin with "executing and attempting to execute a scheme and artifice to defraud the people of the State of New York of thousands of dollars in public revenues and to obtain this money by means of false and fraudulent pretenses, representations and promises." Thus, the court instructed the jury that the indictment charged a scheme "to obtain ... money" from the State and "to defraud the State of New York of public revenues in the form of New York State payroll checks." The jury was instructed that

[i]n order to find the defendant guilty of the mail fraud conspiracy, you must find that he conspired with at least one other person to place a secretary, or secretaries on the payroll of a New York State Assembly member or members with the knowledge and intent that that person

would work neither for the Assembly or the Assembly member in return for the compensation from the state.

In light of the evidence that Rubin caused approximately one-half the salaries of Wagner and Robles to be paid by the Assembly and that they spent no more than 1–2% of their time working on Assembly matters, the evidence amply supported the allegation that Rubin had fraudulently deprived the State of many thousands of dollars, and had not just deprived its citizens of their rights to honest government. His conduct was thus unlike that at issue in *McNally* and was well within the scope of the mail fraud statute.

## CONCLUSION

We have considered all of Rubin's arguments on this appeal and have found them to be without merit. The judgment of conviction is affirmed.

MESKILL, Circuit Judge, dissents in part in a separate opinion.

MESKILL, Circuit Judge, dissenting in part:

Although I agree with much of what is said in the majority opinion, I respectfully dissent from the majority's conclusion that there was sufficient evidence to support Rubin's conviction for conspiracy to file false income tax returns.

Rubin was convicted by the jury of conspiring to cause Marilyn Wagner to file false income tax returns, in violation of 18 U.S.C. § 371 (1982), and of aiding and assisting her in the filing of such returns, in violation of 26 U.S.C. § 7206(2) (1982). Although it is possible for a jury to convict a person of both crimes based on the same set of facts, the two offenses are separate and distinct. A conviction under 26 U.S.C. § 7206(2) requires proof that a person willfully aided and assisted another in the filing of materially false returns, *see United States v. Perez*, 565 F.2d 1227, 1233–34 (2d Cir.1977); *United States v. Dahlstrom*, 713 F.2d 1423, 1426–27 (9th Cir.1983), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed. 2d 835 (1984), whereas a conviction for conspiracy requires proof that two or more people knowingly and voluntarily entered into an agreement to file false returns. *See United States v. Tyler*, 758 F.2d 66, 70–71 (2d Cir.1985) (citing *United States v. Bright*, 630 F.2d 804, 813 (5th Cir.1980)). Thus, the critical difference between the two offenses is the unlawful agreement that must lie at the heart of any conspiracy. *See United States v. Wardy*, 777 F.2d 101, 107 (2d Cir.1985), *cert. denied*, 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986); *United States v. Barnes*, 604 F.2d 121, 154 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). The existence of such a conspiratorial agreement can be inferred by the jury from circumstantial evidence, *see, e.g., Wardy*, 777 F.2d at 107 (citing *United States v. Turcotte*, 515 F.2d 145, 150 (2d Cir.), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975)), but there must be evidence of *some* agreement. *Id.* (citing *United States v. Kates*, 508 F.2d 308, 310 (3d Cir.1975)).

Although Rubin was convicted of aiding the filing of false income tax returns under 26 U.S.C. § 7206(2) and not under the general aiding and abetting provision of 18 U.S.C. § 2 (1982), our decisions discussing the distinction between conspiracy crimes and aiding and abetting crimes illustrate the majority's error in failing to distinguish between the two crimes at issue here. We have often pointed out that conspiring to commit a crime is a wholly separate and distinct offense from that of aiding and abetting another in the commission of an unlawful act. *See, e.g., United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986), *aff'd*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *Tyler*, 758 F.2d at 70–71. As we have noted:

The essence of conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a "community of unlawful intent" between the aider and abettor and the principal. While a community of unlawful intent is similar to an agreement, it is not the same. Thus, a defendant may wittingly aid a criminal act and be liable as an aider and abettor ... but not be liable

for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act.

*Id.* (quoting *Bright*, 630 F.2d at 813). The critical difference is that conspiracy "requires proof of [some] 'preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting.' " *Wardy*, 777 F.2d at 107 (quoting *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir.1983), *cert. denied*, 465 U.S. 1028, 104 S.Ct. 1289, 79 L.Ed.2d 691 (1984) (quoting *United States v. Peterson*, 524 F.2d 167, 174 (4th Cir.1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976)). Thus, when a defendant has been convicted both of conspiracy and of aiding and abetting, and the proof offered at trial has not adequately satisfied the more exacting standards for conspiracy, we have reversed the conspiracy conviction. *See Wardy*, 777 F.2d at 107–08; *Tyler*, 758 F.2d at 70–71.

In this case, there was no evidence from which the jury could reasonably have inferred that Marilyn Wagner was acting pursuant to an agreement with Rubin when she failed to report income earned in 1981 and 1982. It is true, as the majority notes, that Rubin had tried to make Wagner's overall salary package more attractive by advising her that income from the Queens Democratic Organization (QDO) would be non-taxable. There is nothing to suggest, however, that Rubin elicited or sought an "agreement" from Wagner that she would, in fact, refrain from reporting the income. Moreover, there is no evidence that Rubin would have gained anything if Wagner did not report the income or lose anything if she did report it. When Wagner filed her income tax returns, it appears that she simply acted on Rubin's bad legal advice provided during a previous conversation. Rubin's limited remarks to Wagner at that time, as relayed to the jury by Wagner, could have created a reasonable inference that the two parties were engaged in the type of joint activity that is common to aiding, assisting or abetting. *See Wardy*, 777 F.2d at 107; *Tyler*, 758 F.2d at 70. However, his mere assistance in facilitating a subsequent unlawful act was insufficient to constitute the type of mutual agreement required for a conspiracy. *See id.* at 69–71.

I also cannot accept the majority's suggestion that Rubin's later comments to Mary Robles add in some material way to the evidence of a conspiratorial agreement. Although Rubin's remarks to Robles offer general support for the theory that he put both women on notice that their income from the QDO would be "off the books," the evidence again falls short of supporting any reasonable inference that there was a mutual understanding regarding Wagner's future conduct with respect to her income tax returns. Moreover, the jury ultimately acquitted Rubin of aiding and assisting Robles in filing false income tax returns, apparently concluding that his conduct was insufficient to support a conviction under 26 U.S.C. § 7206(2).

In sum, I fear that the majority has failed to maintain the subtle, yet critical, distinction between a conspiracy to commit a crime and the aiding, assisting or abetting of another in the commission of a crime. The majority's affirmance of both convictions based on the evidence in this case renders the liability associated with aiding or assisting another virtually indistinguishable from the "preconcert and connivance" associated with an unlawful agreement among criminal co-conspirators. *See Wardy*, 777 F.2d at 107.

For all of the foregoing reasons, I would reverse Rubin's conviction for conspiracy to file false income tax returns as having been based upon insufficient evidence. I would affirm the convictions on the other counts.