**UNITED STATES of America,
Appellant,**

v.

**James E. ARRINGTON, Appellee.**

No. 82–5250.

United States Court of Appeals,
Fourth Circuit.

Argued April 15, 1983.

Decided Oct. 14, 1983.

Certiorari Denied Feb. 21, 1984.
See 104 S.Ct. 1289.

William P. Sellers, IV, Asst. U.S. Atty., Roanoke, Va. (John P. Alderman, U.S. Atty., Thomas J. Bondurant, Jr., Asst. U.S. Atty., Roanoke, Va., on brief), for appellant.

Barbara H. Fleisher, Charleston, W.Va. (Preiser & Wilson, L.C., Charleston, W.Va., on brief), for appellee.

Before WIDENER and SPROUSE, Circuit Judges, and FOX,* District Judge.

SPROUSE, Circuit Judge:

The United States of America appeals from the judgment of the district court acquitting attorney James E. Arrington, Jr., for lack of sufficient evidence, after a jury had found him guilty of aiding and abetting the receipt and sale of stolen construction equipment moving in interstate commerce, in violation of 18 U.S.C. § 2315. The government contends that there was substantial evidence to support the jury's verdict under the standard of *United States v. Steed,* 674 F.2d 284 (4th Cir.1982) (en banc). We agree and reverse the district court's judgment of acquittal.

Four men, Mitchell, Crockett, Sexton, and Davenport stole a truck, attached trailer, and backhoe in Georgia and brought them to Virginia where a "finder" introduced them to an innocent purchaser, Shipley. Charles Mays, an ex-police officer, was an investigator for Arrington's firm, who sometimes solicited legal business for the firm in exchange for a portion of the fees. He invested several thousand dollars in the criminal enterprise after the equipment arrived in Virginia, and helped the four men move the items to a storage location in Buchannon County, Virginia. The government does not contend that Arrington was involved in or was even aware of the theft and transportation until after those criminal acts were completed and he was employed as an attorney to effect transfer of the equipment to Shipley.

It is the testimony concerning Mays' association with Mitchell, Crockett, and Sexton, and their subsequent association with Arrington, that generates the issue of whether the jury's conviction rested on substantial evidence. That evidence, viewed most favorably to the government, *United States v. Steed,* 674 F.2d at 286, shows that a "finder" brought Shipley to the group's attention. Shipley offered and the group accepted $19,200 for the three pieces of equipment. Shipley, who was from Tennessee, had an attorney in that state, but none in Virginia. Crockett suggested two attorneys from Arrington's nearby firm. Shipley and the group possessing the illegally obtained equipment agreed to meet in Arrington's law office the next day. Arrington was still not aware of the pending transaction.

Mays, Crockett, and Sexton, anticipating an attempt to transfer title, concocted a story that a fictitious owner had physical possession of the titles to the equipment.

---

* Hon. James C. Fox, United States District Judge for the Eastern District of North Carolina, sitting by designation.

Their scheme called for Sexton to respond to the fictitious owner's name at a given telephone number should Arrington call concerning the titles. There is no evidence that Arrington was aware of this scheme.

The meeting was held as proposed in Arrington's office on July 8, 1980. Crockett, Shipley, Arrington, and others were present. Mays was not there that day, having business in another town. Crockett ushered the other participants to Arrington's upstairs office. Shipley observed what appeared to be a factory bill of sale lying on Arrington's desk with the price Crockett allegedly paid for the backhoe; a telephone number was written on the bill. Arrington called that number, conversed with the person who answered the telephone, and advised the parties that it would take several days to get the titles.

Shipley was reluctant to pay the entire purchase price before receiving valid titles and a bill of sale. The parties agreed that he would take possession of all the equipment immediately, and Arrington would deposit the purchase price of $19,200 in the firm escrow account. There is conflict in the testimony about the exact arrangements for disbursement to which Arrington agreed, and on appeal the government and Arrington dispute the probative inferences flowing from the testimony. Again, viewed in a light most favorable to the government, the jury could properly have inferred that Arrington agreed to pay $12,500 to Crockett as soon as Shipley's check was honored.[1] At the same time, he was to deliver a check for $1,700 to the "finder." Arrington was to retain $5,000 until Shipley advised him that he had received the title to the truck and trailer.[2]

The following day, July 9, Mays was again in Arrington's office. Arrington had prepared a bill of sale for the backhoe from Crockett to Shipley Homes, Inc., a construction company owned by the purchaser, and told Mays to forge Crockett's name to the bill of sale. After Mays did so, Arrington stated to Mays that "the equipment was stolen." This latter evidence was introduced by the testimony of Mays:

Okay, at that—After the bill of sale was notarized and after Ms. Jackson had notarized the bill of sale and I had signed it and I walked back down the hall and Mr. Arrington walked back down the hall and he said the equipment was stolen and I said, yeah. He said, well, go ahead and take care of it when he comes in.

This is the only direct evidence probative of Arrington's knowledge that the equipment was stolen at the time of his participation in the initial transfer proceedings.

In addition to the background summarized above, the government at trial presented the following evidence which it maintains corroborates the direct evidence of Mays' testimony. Mays obtained Shipley's address from Arrington and mailed him the backhoe bill of sale bearing Crockett's notarized signature as forged by Mays. Mays obtained a fraudulent Kentucky title for the truck from Sexton and a fraudulent Virginia title for the trailer. Arrington looked at these titles and returned them to Mays. Mays delivered them to Crockett who, in turn, mailed both titles to Shipley.

As soon as Mays obtained the fraudulent titles, Arrington ordered his firm's bookkeeper to disburse all of the funds, including the $5,000 for the truck and trailer. Crockett, Sexton and Mays divided the proceeds of the $12,500 and $5,000 checks.[3] The bookkeeper recorded the disbursements on a ledger and later testified that Arring-

---

1. Under Virginia law, it was not necessary to produce a title in order to transfer ownership in a backhoe.

2. This is the disputed portion of this part of the evidence. Arrington contends he was to release the $5,000 when he was satisfied as to the title. The government contends he was only to release it after receiving approval from Shipley.

3. The prosecution introduced testimony of Mays, as hearsay evidence under the umbrella of Fed.R.Evid. 801(d)(2)(E), that Crockett told Mays that Crockett paid Arrington $2,800 from the distribution. As Arrington was acquitted of the conspiracy charge, we agree with him that his evidence cannot be considered in determining whether there was substantial evidence to support the aiding and abetting conviction.

ton seemed irritated when he discovered she had recorded the transaction. She also testified that Arrington did not record his attorney fee of $70.00 in the firm's books.

When Shipley received the titles, he noticed that the Kentucky title was to a 1977 white truck, whereas he had purchased a 1978 blue truck. Shipley's attorney, Caldwell, telephoned Arrington's firm immediately from Tennessee. Caldwell could not contact Arrington, but spoke to a man identifying himself as Mr. Schelin, one of Arrington's partners. He advised Schelin not to distribute the funds, but Schelin investigated and told Caldwell that the funds already had been disbursed.[4] Caldwell immediately confirmed the telephone conversation with Schelin by a letter addressed to the Arrington's firm. Two or three days later Caldwell received a telephone call, which he thought and felt was from Arrington's firm, explaining that the flaw in the title was the result of the truck's having been assembled from junk vehicles.

The firm's bookkeeper testified that several months later, after Mays was indicted for his role in the crime, "I told Mr. Arrington that I had heard that the law firm was involved and was it true, was this true. And he said it may have been."

The government, citing our standard of review in *Steed,* contends that the trial court committed error in granting Arrington's motion for acquittal after the jury found him guilty. We agree with the government's contention.

In *Steed,* we held that the same standard applies whether we are reviewing the government's appeal of a judgment of acquittal entered after a jury verdict of guilty or the defendant's appeal of a jury conviction. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." 674 F.2d at 286 (quot-

ing *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

Respected arguments have been made that a trial court's judgment of acquittal for insufficient evidence after a jury verdict of guilty should have the same weight on appeal as if it were made by the original factfinder.[5] This court adopted a contrary rule in *Steed,* however, and regardless of how we might have weighed the evidence of Arrington's guilt had we been factfinders, in assessing the sufficiency of the evidence to support the jury's determination, we can only inquire whether there is substantial evidence, taking the view most favorable to the government, from which the jury might find the defendant guilty beyond a reasonable doubt. *United States v. Block,* 590 F.2d 535, 543 (4th Cir.1978); *United States v. Sherman,* 421 F.2d 198, 199 (4th Cir.) (per curiam), *cert. denied,* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970). We, of course, do not weigh the evidence or review the credibility of witnesses in resolving the issue of substantial evidence. *Glasser v. United States,* 315 U.S. 60, 80 (1942); *Pigford v. United States,* 518 F.2d 831, 836 (4th Cir.1975) (per curiam).

The jury was confronted with a clear-cut credibility decision in weighing the testimony of Mays against that of Arrington and other witnesses. We can understand trial court's frustration on observing a witness with Mays' obvious character defects and realizing that the jury verdict, of necessity, rested in large part on the jury crediting his testimony. If there is sufficient evidence under the *Steed* standard, however, a trial court, which would decide the outcome of a criminal case on grounds of credibility and weight of the evidence, must act before the task of resolving factual issues inherent in those grounds are entrusted to the jury. Mays' direct testimony was the linchpin of the government's case. He said simply that Arrington told him the equipment was sto-

---

**4.** Schelin testified that he did not remember this telephone conversation, but the firm bookkeeper testified that he approached her relating a strange telephone call requesting that the funds not be disbursed. The bookkeeper then informed Schelin that the funds had been dis-

bursed and that he should talk to Arrington for the details.

**5.** See the original panel opinion in *Steed,* 646 F.2d 136 (4th Cir.1981).

len and instructed him to "take care of it." He said Arrington also had him forge Crockett's name to the bill of sale and forward it to Shipley. We must assume that the jury believed that testimony.

■ Arrington argues, and we agree, that since this incident occurred on July 9, it does not necessarily establish that he knew of the theft before the thieves came to his office on July 8. It was not necessary, however, for the jury to have gone so far as to conclude that Arrington possessed the requisite knowledge before July 9. It was on July 9 that Mays reappeared on the scene. After that date, Arrington acquired the bogus titles and disbursed the escrowed funds. These later actions formed a sufficient basis to find him guilty of aiding and abetting if he knew on July 9 that the equipment was stolen and illegally transported. To be convicted of aiding and abetting, "[p]articipation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result." *United States v. Hathaway*, 534 F.2d 386, 399 (1st Cir.) *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

■ The uncorroborated testimony of one witness may be sufficient to sustain a verdict of guilty. *United States v. Shipp*, 409 F.2d 33 (4th Cir.), *cert. denied*, 396 U.S. 864, 90 S.Ct. 140, 24 L.Ed.2d 117 (1969).[6] Whether it is sufficient, of course, depends on the probative force of the actual testimony. In this case, however, the sufficiency does not rest alone on the probative vitality of Mays' testimony. There was considerable circumstantial evidence which the jury may have considered corroborative. Again, viewing the evidence in a light most favorable to the government, it showed that after his statement of July 9 revealing knowledge that the equipment was stolen, Arrington ordered Mays to forge Crockett's name to the backhoe title, received and looked over the fraudulent truck and trailer titles, and disbursed the $5,000 check, even though he had agreed to hold it for Shipley's instructions. His bookkeeper testified that he was irritated when he discovered that she had made a firm record of the transactions. After Shipley protested that the title to the truck was faulty and tried to prevent the disbursement, Arrington took no action to investigate or to correct the possible innocent or negligent part that he might have played in the transfer of a truck with a faulty title.

■ Arrington contends, however, that since the jury acquitted him of conspiracy to receive and sell stolen equipment moving in interstate commerce, its verdict finding him guilty of aiding and abetting was inconsistent, and on that basis the district court's judgment of acquittal was correct. He acknowledges the general rule that an inconsistent jury verdict is not a valid basis for a judgment of acquittal. *Hamling v. United States*, 418 U.S. 87, 101, 94 S.Ct. 2887, 2899, 41 L.Ed.2d 590 (1974); *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932). He argues, however, that if he had knowledge of the crime and acted as he did, he would have necessarily participated in the conspiracy. Arrington reasons that since the jury acquitted him of conspiracy, it could not have believed Mays' testimony concerning his knowledge, and therefore his conviction of aiding and abetting cannot stand.

■ There is simply no merit to that argument. There were several obviously differing elements of proof necessary for conviction under the conspiracy and aiding and abetting counts of the indictment. Conspiracy requires proof of "preconcert and connivance not necessarily inherent in the mere joint activity common to aiding and abetting." *United States v. Peterson*, 524 F.2d 167, 174 (4th Cir.1975), *cert. denied*, 423 U.S. 1088, 96 S.Ct. 881, 47 L.Ed.2d 99 (1976). *See United States v. Wyatt*, 561 F.2d 1388, 1391 n. 5 (4th Cir.1977). While the "community of unlawful intent" necessary for aiding and abetting is similar to an agree-

**6.** *Shipp* was a defendant's appeal from a conviction but, in view of *Steed*, the same rule must apply in reviewing the government's appeal for a post-conviction acquittal.

ment, it is not the same. *United States v. Bright,* 630 F.2d 804, 813 (5th Cir.1980). The only evidence which the jury could have considered as proving pre-concert between Arrington, Crockett, Sexton and the others, was the same circumstantial evidence that the government introduced to corroborate Mays' direct testimony which established aiding and abetting. The jury could have simply believed that this was not sufficient to prove the kind of consent necessary to a conspiracy conviction.

The judgment of the district court is therefore reversed and the case is remanded for reinstatement of the jury's verdict and further proceedings consistent with this opinion.

REVERSED AND REMANDED.