925 F.2d 1458
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sonia Darlene SMITH, Defendant-Appellant.
 No. 89-5497.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 7, 1990.
Decided Feb. 20, 1991.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, District Judge. (CR-89-252-A)
 Charles Anthony Brady, Sr., Washington, D.C., for appellant.
 Margaret A. O'Donnell, Office of the United States Attorney, Alexandria, Va. (Argued), for appellee; Henry E. Hudson, United States Attorney, Erika W. Nijenjuis, Special Assistant United States Attorney, Alexandria, Va., on brief.
 E.D.Va.
 AFFIRMED.
 Before K.K. HALL and MURNAGHAN, Circuit Judges, and DAVID C. NORTON, United States District Judge for the District of South Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 Sonia Smith was convicted of one count of conspiracy to commit bank fraud and one count of bank fraud in violation of 18 U.S.C. Secs. 1344(a) and 371. Government witnesses included three participants in the bank fraud scheme, an accountant, and two employees of the credit union at which Smith worked and at which the crimes were committed. Smith has appealed her conviction on both counts on insufficiency of evidence grounds, arguing that conflicting testimony, by reason of the conflict, should not support a jury finding of guilt beyond a reasonable doubt.
 
 
 2
 The government put on substantial documentary and testimonial evidence from which a rational trier of fact could reasonably conclude, beyond a reasonable doubt, that Smith was guilty of both the conspiracy and fraud counts. In view of that, the arguments of Smith were unpersuasive under the standard of review enunciated in Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 3
 Between December 1988 and April 1989, approximately $117,000 was stolen from the Patent and Trademark Office Federal Credit Union in Arlington, Virginia. The money was withdrawn from two unauthorized, or "phony," credit union accounts in a series of transactions ranging from $600 to $9,000. Most of the transactions were carried out by means of checks; a few employed cash withdrawals. In each case, the money had been transferred into one of the phony accounts from two credit union accounts used for payroll. All transfers took place on the credit union's computer.
 
 
 4
 Smith was hired in August 1988 as a teller at the credit union, with the understanding that she would be immediately trained as head teller. Smith was also trained on the new computer system which the credit union began using shortly after her arrival. She learned quickly, and was often asked by other tellers to help them with computer problems.
 
 
 5
 At the time Smith was hired, James Delacruz was the credit union's computer operator. The computer operator is the credit union's computer expert, and is responsible for "posting" payroll, or transferring moneys on the computer from the two payroll accounts into the accounts of credit union customers and employees. In order to gain access to the payroll accounts, the computer operator needs a security level higher than that assigned to tellers. Posting can be done only on the "batch informer," a specialized terminal regularly used only by the computer operator and the computer operator's backup. Because the computer operator works four days a week, a second credit union employee serves as a backup and does the computer operator's work when the computer operator is unavailable.
 
 
 6
 Delacruz left the credit union in November 1988. His backup, Loretta Nagel, became the computer operator. Because of Smith's proficiency on the computer, she was selected as Nagel's backup, and then promoted to computer operator in early March 1989, when Nagel left the credit union.
 
 
 7
 On December 9, 1988, credit union accounts 1157 and 1158 were opened on the computer in the names of "M. Umali" and "T. Walker," respectively, without any of the required supporting documentation such as an application or employment verification. When a new account is opened at the credit union, the account number is determined by a log kept near the teller stations. The name of the account-holder and the next number in sequence are written in the log, usually by the person opening the account. Smith admitted that she wrote the names "Michael Umali" and "Thomas Walker" and the new account numbers for 1157 and 1158 on this log.
 
 
 8
 Every credit union employee receives a "teller number" and a password. Employees were instructed to keep their passwords secret and to change them frequently. The teller number is a computer code assigned by management that does not change. Smith's teller number was 14. Number 5 was a "spare" teller number, used when an employee who was not a teller filled in for a teller. Credit union documents showed that teller number 14, and number 5 on days when Smith was filling in as a "spare" teller, were used to open accounts 1157 and 1158, to transfer money into them from the payroll accounts, and to change the account name for account 1158 from "T. Walker" to "T. Ashley" on the same day the account was opened. In addition, teller number 14 was used to transfer money from accounts 1157 and 1158 to Smith's personal credit union account. Teller number 16 was used by the computer operator for posting payroll. Credit union documents showed that after Smith became a computer operator, teller number 16 was used to transfer money out of the payroll accounts into accounts 1157 and 1158. In a few cases, other teller numbers were used.
 
 
 9
 Michael Umali cashed eleven of the twenty checks used to steal the credit union money. Umali was recruited by Delacruz, who was a friend of his. Generally, Delacruz drove Umali to the credit union, and Smith met Umali in the lobby of the credit union building, where she handed him a check. Umali cashed the check, gave the proceeds to Delacruz, and then went back into the credit union building to give part of the money to Smith. In total, Umali gave Smith from $15,000 to $30,000 in cash. On the last occasion, Umali called Smith directly and made arrangements for checks for himself and Gregory Neal. Smith had decided what the amounts of those checks would be.
 
 
 10
 Thomas Ashley cashed three of the checks. Ashley was recruited by Delacruz, a friend, who told him he could make money by taking it out of an account in his name at the credit union. When Ashley cashed his first check, he noticed an "attractive young lady" at the credit union. Delacruz told him the young lady was "Sonia," who was their "help" at the credit union, and that she was putting money into Ashley's account. Delacruz told Ashley to keep one-third of the money, and that the rest would be split between Delacruz and "Sonia." Smith personally gave Ashley the second and third checks he cashed, and her fingerprint was on the second check.
 
 
 11
 Gregory Neal, who was recruited by Umali, cashed one of the checks. When Neal went to the credit union with Umali, they met Smith in the lobby of the building, where she was introduced to Neal as "Sonia." He saw Smith give a check to Umali, who gave it to Neal to cash.
 
 
 12
 Smith's annual salary at the credit union ranged from $15,000 to $20,000. Between September and December 1988, her balance in a bank account at American Security Bank was always less than $50, and her balance in her account at the credit union during December 1988 did not exceed $715. Between January and the end of March 1989, she deposited $13,500 into the American Security Bank account, of which at least $13,000 was cash. In February 1989, she bought a $5,000 Certificate of Deposit. She admitted that she paid $6,000 in cash for a red Corvette in April 1989.
 
 
 13
 In April 1989, shortly after Smith learned that the theft had been discovered, the phony accounts were closed and the remaining balances transferred into Smith's account. In addition, the account numbers were changed on the computer from 1157 and 1158 to 1411 and 1409, respectively, which had the effect of hiding the accounts from normal search procedures. Such changes can be made only on the batch informer. Smith admitted that she wrote the new account names and numbers on the account log. Smith and the credit union manager were the only credit union employees who knew how to change the account numbers on the computer.
 
 
 14
 Smith was indicted on July 27, 1989 in the United States District Court for the Eastern District of Virginia on a charge of committing bank fraud by devising with James Delacruz a scheme to steal money from a federally insured credit union by transferring funds into unauthorized credit union accounts and arranging for others to cash checks debited against the accounts, and a charge of conspiracy with Delacruz and the others to commit the bank fraud. She pled not guilty.
 
 
 15
 At trial, the United States presented three stipulations, numerous documents, and the testimony of eight witnesses. At the close of the government's case, Smith made a motion for judgment of acquittal. The district court judge, Cacheris, J., denied the motion. Three defense witnesses and the defendant then testified, and the government offered one rebuttal witness before the case was submitted to the jury.
 
 
 16
 On September 19, 1989, Smith was convicted of bank fraud, in violation of 18 U.S.C. Sec. 1344(a), and of conspiracy to commit bank fraud, in violation of 18 U.S.C. Sec. 371. On November 17, 1989, Smith was sentenced to a term of imprisonment of 26 months on each count, to run concurrently, 3 years supervised release, restitution in the amount of $34,480.01, and $100 in special assessments.
 
 
 17
 Evidence presented during the government's case in chief was amply sufficient to support a finding of guilt beyond a reasonable doubt by a rational trier of fact. Smith's claim of insufficiency relies primarily on assertions of veracity and conflicting testimony, assertions having no bearing upon insufficiency under the standard of review enunciated in Glasser and United States v. Arrington, 719 F.2d 701, 704 (4th Cir.1983), cert. denied, 465 U.S. 1028 (1984).
 
 
 18
 Conspiracy may be proven by both direct and circumstantial evidence. Delli Paoli v. United States, 352 U.S. 232, 236 n. 4 (1957). Accordingly, the judgment is
 
 
 19
 AFFIRMED.