996 F.2d 1213
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellant,
v.
James E. GAINES, Defendant-Appellee.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
James E. GAINES, Defendant-Appellant.
 Nos. 92-5446, 92-5501.
 United States Court of Appeals,
Fourth Circuit.
 Argued: February 5, 1993.
Decided: June 23, 1993.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CR-91-487-A)
 ARGUED: Donald Bruce Weber, Special Assistant United States Attorney, Alexandria, Virginia, for Appellant.
 Richard Thurman Brothers, Brothers & Coyne, Seattle, Washington; George J. Atwater, III, Law Office of Robert W. Tate, Seattle, Washington, for Appellee.
 ON BRIEF: Richard Cullen, United States Attorney, Joseph J. Aronica, Assistant United States Attorney, Jack I. Hanly, Assistant United States Attorney, Alexandria, Virginia, for Appellant.
 E.D.Va.
 AFFIMED IN PART, REVERSED IN PART, AND REMANDED.
 Before WIDENER, PHILLIPS, and HAMILTON, Circuit Judges.
 OPINION
 WIDENER, Circuit Judge:
 
 
 1
 The defendant, James E. Gaines, was indicted of one count for conspiracy to defraud under 18 U.S.C. § 371 (Count I); one count of receiving an illegal gratuity in violation of 18 U.S.C. § 201(c)(1)(B) (Count II); one count of conversion of government property in violation of 18 U.S.C. § 641 (Count III); and four counts of unlawful use of the telephone in violation of the Travel Act, 18 U.S.C. § 1952 (Counts IV-VII). After a jury trial, a guilty verdict was returned on all counts except Count I of which Gaines was acquitted. Gaines thereafter filed a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c), which the district court granted as to Count II. The district court denied the government's motion for reconsideration regarding Count II.
 
 
 2
 The government appealed the district court's setting aside of the jury verdict on Count II (the illegal gratuity charge) and Gaines cross-appealed, with assignments of error relating to his convictions and to the course of trial. We reverse the district court's grant of Gaines's motion for judgment of acquittal on Count II, and affirm the district court in Gaines's cross-appeal.
 
 
 3
 Gaines worked at various duties for about 30 years at Boeing. He first worked in the manufacturing portion of the Boeing Transport Division, helping to build the KC-135 airplane. He also worked on the 707 commercial airplane. After ten years in manufacturing, he moved to engineering, where he worked approximately ten years on new business planning and proposal writing. His last ten years was in international sales, where he worked to promote Boeing's interests abroad. It was at Boeing that Gaines first met Melvin Paisley, a fellow employee.
 
 
 4
 Gaines began to work closely with Melvin Paisley in 1972, when Gaines's duties involved analyzing potential foreign customers of Boeing military products, and Paisley's duties involved going to foreign countries and meeting military people. Gaines and Paisley also formed a social relationship that extended to their spouses and families. In 1978 Paisley was reassigned within Boeing, leaving the international marketing organization. In 1981 Paisley retired from Boeing and went to Washington, D.C. to take an appointment as the Assistant Secretary of the Navy for Research, Engineering, and Systems, serving directly under the Secretary of the Navy.
 
 
 5
 The relationship between Gaines and Paisley continued during this time. In 1982, Paisley nominated Gaines to a task force of the Department of Defense Defense Science Board, and Gaines took the assignment under the sponsorship of Boeing. This caused Gaines to travel to Washington for various meetings where he also would see Paisley socially. Other contacts between the two during this time included Gaines helping Paisley's two sons to get jobs at Boeing and Gaines serving on the Naval Research Advisory Committee panel, again being nominated by Paisley.
 
 
 6
 In the same time frame, Paisley developed both a personal and business relationship with William Galvin. Galvin was a private defense consultant operating under the name Athena Associates. Paisley met Galvin in Washington, D.C. soon after he became an Assistant Secretary of the Navy. Galvin represented many large defense contractors, including General Dynamics, Lockheed, Boeing, McDonnell Douglas, and General Electric. Galvin's work ostensibly entailed pushing projects for his principals within the Department of Defense, but also included acquiring high level entr# B1# e to the Department of Defense. Having a lot in common with each other as former military aviators, Paisley and Galvin formed first a business, and then a personal, relationship to the point that they had agreed that after Paisley left his position as an Assistant Secretary of the Navy, he and Galvin would join as private consultants. These business plans were formed in 1984-85.
 
 
 7
 It was also during this time that Paisley began to ask Gaines to apply for a job opening on Paisley's staff in Washington, D.C. At first Gaines was not interested in leaving Seattle and refused. But in 1985, at the suggestion of one of Paisley's aides, Gaines applied for the job and was accepted. After some initial reluctance, Gaines retired from Boeing and left Washington state for Washington D.C., to serve under Paisley as the Director, Acquisition Programs, International Programs, and Congressional support for the Navy. Gaines's job was rated as a Senior Executive Service-4, which was the equivalent, Gaines testified, to the Navy's one star admiral.[1]
 
 
 8
 Gaines's duties in this position included advising Navy staff on policy consistencies with potential procurement contracts, preparing memoranda of understanding with foreign governments concerning technology transfers, preparing documents for Congress concerning the posture of his department, and producing special studies on various contracting issues for Paisley directly. Paisley also showed Gaines around Washington, D.C., including reintroducing him to William Galvin, the defense contractor consultant Paisley had formed close ties with and whom Gaines had met briefly before in Washington state.
 
 
 9
 In 1987, Paisley resigned from his position with the Navy. Paisley's last day in office was March 31, 1987. The next day he started a consulting business, in conjunction with Galvin. Galvin hired Paisley as a consultant, and for a period of time, they shared office equipment and staff. Gaines, however, remained with the Navy, performing essentially the same duties but under a different boss.
 
 THE OFFENSE CONDUCT
 
 10
 The government's factual case against Gaines was essentially twofold. First, that during Gaines's employment with the Navy he supplied sensitive information and provided beneficial services to Melvin Paisley and William Galvin. While Paisley was in office, Gaines supplied confidential, sensitive, and classified information to Galvin. After Paisley left office, Gaines's role became even more important as a pipeline for information out of the Navy to both Galvin and Paisley in their roles as consultants. The conversion charge against Gaines related to Gaines giving Paisley, without authorization, a classified Navy document.
 
 
 11
 Secondly, the government showed that throughout much of Gaines's employment with the Navy, both Galvin and Paisley gave Gaines valuable amenities. These amenities included theater tickets, tires, financial support for his son's printing business, and an expensive lithograph. The lithograph formed the basis for the illegal gratuity charge against Gaines under § 201(c)(1)(B), while tape recorded phone conversations dealing with the acceptance of other amenities and the giving of information formed the basis for further illegal gratuity crimes serving as predicate offenses under four separate Travel Act charges.
 
 
 12
 To best lay out the course of these events, we will discuss Gaines's conduct in his official capacity that served to aid Galvin and Paisley with their private principals during Gaines's time at the Navy Department, and then relate gratuities Gaines received from those two men during that same time period.
 
 
 13
 Gaines's actions helping William Galvin began while Paisley was still in office. He started, for example, by aiding Galvin and Paisley in connection with the programs known as ALR-67 and Moon. With the ALR-67, Paisley's and Galvin's strategy was to have the Navy request the prime contractor, Litton ATD, select another contractor (referred to as a second source) to produce the system, ostensibly to save the Navy money. Galvin's interest was in having either one of his principals or Dalmo Victor (a corporation) as the second source, because he believed Dalmo Victor would subcontract with Whittaker, who also was one of his principals. Gaines's role on this project was, upon the request of Paisley in Galvin's presence, to go to Litton Industries and try and convince that company to select Dalmo Victor, instead of TRW, the previously selected low bidder, as the second source.
 
 
 14
 Similar or like efforts were exerted by Gaines on behalf of Galvin, at the instance of Galvin or Paisley or both, both while Paisley was yet in office and after he resigned. The efforts of Galvin and Paisley on behalf of numerous and various defense contractors through Gaines extended for several years and commonly took the form of Gaines securing otherwise unavailable information about a program, or of Gaines using the information he had to get some defense contractor represented by Galvin or Paisley to participate in a program. Documents not readily available to the general public were made available to Paisley or Galvin by Gaines. It is patent that Gaines had access to such information and documents by virtue of his office.
 
 
 15
 Gaines was convicted upon count three of the indictment of converting Navy Research Advisory Committee documents of a value in excess of $100. In September 1987, Paisley asked Gaines to give him a copy of certain classified briefing papers of the Navy Research Advisory Committee studies which had been completed that summer, but had not been authorized for release to contractors. Gaines agreed to do that. He subsequently provided the papers to Paisley. Gaines had no authority to give Paisley the NRAC studies. He neither sought permission to disclose them, nor informed anyone that he had. Gaines explained that he had given Paisley those documents because he thought that Paisley was cleared for them, that Paisley had worked on them extensively before he had left office, and that Paisley was going to use them in the best interests of the Navy. Later, when investigators asked Gaines whether he had given the NRAC summer studies to anyone outside of Navy channels, Gaines denied that he had done so, and denied giving any classified information to Paisley after Paisley left office.
 
 
 16
 Throughout this period, the evidence also showed that Gaines was receiving benefits and things of value from Galvin and Paisley. During the time frame that Paisley was still in office, from early 1986 to early 1987, Gaines accepted gratuities from Galvin. These included theater tickets, meals, and the use of Galvin's chauffeured automobile. Gaines accepted theater tickets on at least six occasions. On one occasion, Galvin provided Gaines's wife and her guests with tickets to several Broadway shows in New York. On another occasion, Galvin arranged for Gaines and his party to pick up over $150 worth of tickets to the Neil Simon play Biloxi Blues at the Kennedy Center box office. Shortly before Paisley left office, Gaines approached Galvin and asked for some automobile tires for Gaines's car in Seattle which Gaines's daughter was using. Gaines had learned that Galvin had the ability to supply tires through his client Goodyear. Galvin placed the order for Gaines and eventually, Gaines received the tires. Gaines testified that he told his daughter to insist on paying for the tires when she picked them up, but she did not. Gaines later denied receiving these tires in a subsequent interview with federal investigators.
 
 
 17
 After Paisley left office, Gaines and his family continued to receive theater tickets from Galvin. Galvin arranged for them to receive, without charge, four tickets to see the Pacific Northwest Ballet at the Kennedy Center, and six tickets to see the play I'm Not Rappaport at the National Theater. The ballet tickets were worth $224 and the play tickets were worth $360. In September, Paisley took Gaines, his wife, and two of their daughters to see Cabaret at the Kennedy Center.
 
 
 18
 On another occasion, Gaines and his wife attended, at no charge to them, a closed circuit telecast of the Leonard/Hagler fight at the Capitol Centre. Paisley helped make the arrangements for them to attend and Galvin obtained the tickets for them through Sperry/Unisys.
 
 
 19
 In April of 1987, Gaines told Galvin he was considering returning to Seattle. Galvin testified that he depended on Gaines remaining in place, so he and Paisley met with Gaines and encouraged him to stay. Galvin testified that he and Paisley suggested that they might help Gaines by financially supporting Gaines's son's new printing business. The evidence showed that Gaines obtained from his son, Sean, some price quotes for Galvin. Gaines also prepared a cover letter on his computer at work on behalf of Sean's business, New Graphix, which was included in the price quotes to Galvin. Gaines denied at trial that there was a plan to have Galvin and Paisley provide financial support for his son's printing business. Only Paisley, rather than Galvin, ordered services from Sean Gaines. Paisley's check for services was the first one received by Sean Gaines's printing business.
 
 
 20
 When Paisley received the first invoice from Gaines's son, he discussed it with Galvin. Galvin was upset that Gaines's son had used his own name on the invoice. The recorded conversation between Galvin and Paisley concerning this issue has Galvin saying, "But that wasn't the deal .... [n]obody listens. First of all I said, 'Is your name going to appear?' He said, 'No, they've got a name of a company." Galvin soon after said, "Here you're paying a government employee. Again that's why I asked him about the tires ... I don't want Gaines's name on his tires." They decided to change the name on the invoice to reflect the company name, and discussed giving Gaines's son a $500 retainer for creative ideas. Although they never did that, Paisley had the invoice changed to show New Graphix as the payee instead of Sean Gaines.
 
 
 21
 In August 1987, Paisley ordered the Lonesome Whistle lithograph for Gaines. The lithograph was a numbered special edition and was worth $1400. It was triple-matted in a custom oak frame, and its border featured a color remarque hand-drawn by the artist.
 
 
 22
 Paisley also ordered other lithographs for senior executives of corporations that were his principals. However, the other lithographs were worth less than the one given to Gaines. In a taped conversation, Paisley told Gaines that an executive of Martin Marietta was also getting a lithograph. Gaines admitted to receiving the lithograph in December 1987, and he was aware that the lithograph was valuable, but testified that he believed it to be a purely personal gift because of his long friendship with Paisley. Gaines gave Paisley a brass pencil sharpener in return for Christmas.
 
 I. The Government's Appeal
 
 23
 The government appeals the district court's setting aside of the jury verdict in Count II under Fed. R. Crim. P. 29(c).[2] This count charged Gaines with receiving the Lonesome Whistle lithograph in violation of 18 U.S.C. § 201(c)(1)(B). That section provides:
 
 
 24
 (c) Whoever-
 
 
 25
 (1) otherwise than as provided by law for the proper discharge of official duty-
 
 
 26
 ....
 
 
 27
 (B) being a public official ... otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person.
 
 
 28
 The district court found that there was insufficient evidence as a matter of law for the jury to have found that the lithograph was for anything other than a Christmas present, and that to have found Gaines guilty, the jury would have had to base its verdict on speculation and guilt by association with the evidence of William Galvin's actions.
 
 
 29
 We review the district court's granting of a motion for a judgment of acquittal after a jury verdict the same way we review a denial of that same motion to a defendant after a jury verdict. United States v. Garcia, 868 F.2d 114, 115 (4th Cir.), cert. denied, 490 U.S. 1094 (1989). "A jury's verdict must be left undisturbed 'if there is substantial evidence, taking the view most favorable to the government, to support it.' " Garcia, 868 F.2d at 115 (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)).
 
 
 30
 Gaines and the government are not in dispute over the proof of the first two elements of the § 201(c)(1)(B) charge, that Gaines was a public officer and that the lithograph was a thing of value. The other elements of this section, however, are disputed by both sides on the law and facts. The government argues that it need only have proven that Gaines knowingly received the lithograph in whole or part for or because of official acts performed or to be performed by him; and Gaines argues that the standard used by the government and by the district court in its jury instructions is wrong. Gaines contends that the government should have been required to prove that he accepted the lithograph with the knowledge that it was given solely for the purpose of his performance of official acts, not out of friendship, and that moreover, the gift was required to have been given to himself alone and not to any other person. Gaines also argues that, although he claims the district court was incorrect as to the legal standard, it was still correct in setting aside the verdict on this charge because the evidence was insufficient for the jury to have found him guilty even under the instructions given, as the evidence showed that Gaines could only have believed he was getting the lithograph from Paisley out of friendship.
 
 
 31
 We are in agreement with the government's characterization of the correct standard. The statute mentions nothing which can be construed as requiring the gift to be given solely for official acts. In United States v. Standefer, 610 F.2d 1076, 1080 (3rd Cir. 1979) (en banc), aff'd on other grounds, 447 U.S. 10 (1980), the court stated that it is enough that the gift be "because of ... official position and not solely for reasons of friendship or social purposes." This was essentially the law given to the jury by the district court, and we are of opinion it is correct. It is enough that the official received something of value-there is no requirement that the thing of value could not have also benefitted some other person, directly or indirectly. Moreover, it could in part have been given and accepted out of friendship. Thus, the fact that the lithograph might have been given to Gaines in part out of the friendship of Paisley or given in part to Mrs. Gaines is not determinative. The government must have proven only that the defendant received the gift in part for or because of the performance of official acts.
 
 
 32
 Gaines knew the lithograph was expensive.[3] He knew that Paisley had given lithographs to Paisley's business associates. While the evidence showed that both Paisley's and Gaines's families exchanged gifts for years, the lithograph was more expensive than typical and moreover, the reciprocal gift given by Gaines to Paisley was a brass pencil sharpener. Gaines also knew that he had served as a stimulant for information to Paisley on a variety of sensitive Navy defense programs in Paisley's role as a private consultant and that he was useful to Paisley in Paisley's business.
 
 
 33
 Taking all of these facts in the light most favorable to the government, we are of opinion that there was substantial evidence for the jury to have inferred that Gaines knew Paisley's expensive gift-giving was not solely for the sake of friendship, but that instead he knew that the lithograph was given, at least in part, for the performance of his official acts. No showing of an exact quid pro quo is necessary. See United States v. Muldoon, 931 F.2d 282, 287 (4th Cir. 1991). Because we find that substantial evidence existed to sustain the jury's verdict, we reverse the district court as to Count II.
 
 II. Jury Instructions
 
 34
 Gaines also claims that the district court erred in the giving of the jury instructions on the illegal gratuity charge by confusing the jury. Gaines argues that the district court's instruction to the jury as to both four and three elements of the crime was reversible error.
 
 
 35
 An examination of both instructions given to the jury reveals that they were essentially the same. In the first instruction, the district court instructed the jury:
 
 
 36
 Now, there are three essential elements the Government must prove. Actually there are four, I shouldn't say three. First that the defendant was a public official. And in this case the defendant was an employee of the United States Navy and was a public official.
 
 
 37
 Second, that the defendant directly or indirectly demanded, sought, received, accepted or agreed to accept something of value personally.
 
 
 38
 Third, the thing of value sought or received was for the proper discharge of official duty. And four, that the defendant sought or received the thing of value knowing that it was in whole or in part for or because of any official act performed or to be performed by him.
 
 
 39
 A side bar conference was held with the district court, however, in which counsel on both sides pointed out that the instruction given was not the one agreed upon by the parties and court. The district court immediately reinstructed the jury as follows:
 
 
 40
 Now, this deals with count two, which alleges the receipt of an illegal gratuity. And there are three essential elements which the Government must prove. First, that the defendant was a public official. And I have already told you that being employed by the United States Navy, that he is a public official.
 
 
 41
 Second, that the defendant directly or indirectly demanded, sought, received, accepted or agreed to accept something of value personally.
 
 
 42
 And third, that the defendant sought or received the thing of value knowing that it was in whole or in part for or because of any official act performed or to be performed by him.
 
 
 43
 The next day, the jury requested clarification on the elements of Count II. The district court gave the jury the same corrected instruction it had given the jury the previous day.
 
 
 44
 We are of opinion there was no error. In the first instruction, the district court's third element was at most surplusage. The district court's latter instruction was sufficient and correct as to the law. Moreover, any possible confusion the jury may have had was corrected by the district court's repetition of the second instruction the next day. Accordingly, Gaines's argument is without merit.
 
 III. Co-conspirator Statements
 
 45
 Next, Gaines argues that the admission of certain co-conspirator's statements at trial was in fact unduly prejudicial hearsay, and thus reversible error, because the district court never made a finding as to the existence of a prima facie conspiracy and because he was eventually acquitted of the conspiracy charge. For the most part, these out-of-court statements consisted of tape recorded conversations between Galvin and Paisley, and Paisley and third parties.
 
 
 46
 Federal Rule of Evidence 801(d)(2)(E) is an exception to the hearsay rule that allows the admission of out-of-court statements made by the co-conspirators of a party if those statements are made "during the course and in furtherance of the conspiracy."[4] The existence of a conspiracy, however, must be shown by substantive evidence of the conspiracy other than the statements themselves, United States v. Dockins, 659 F.2d 15, 16 (4th Cir. 1981), although the out-of-court statements may be considered by the district court in conjunction with the independent evidence. Bourjaily v. United States, 483 U.S. 171, 180-81 (1987). It is the district court's role to make the determination that a prima facie conspiracy existed under the preponderance of the evidence. Bourjaily, 483 U.S. at 175. The district court's findings of fact in that respect are reviewed for clear error. Bourjaily, 483 U.S. at 175, 181.
 
 
 47
 Reviewing the record as a whole, we are of opinion that the government made out a prima facie case of conspiracy by sufficient independent evidence. The conspiracy case against Gaines alleged that Gaines agreed with Galvin and Paisley to release information and perform services, while during that same time, he agreed to receive things of value. There is ample evidence in the record, apart from the out-of-court conversations, showing that Gaines agreed to do this for Galvin and Paisley. The record shows that Gaines discussed with both Galvin and Paisley various details concerning defense programs, while often in the same conversations discussing benefits and amenities. The many recorded conversations of Gaines himself dealing with Paisley and Galvin serves as sufficient independent evidence to both show the existence of a conspiracy and link Gaines to it.
 
 
 48
 Other independent physical evidence of an agreement included the NRAC briefing papers found in Paisley's possession; sensitive documents Gaines admits giving to Paisley; invoices from Gaines's son's printing business with both the name of New Graphix and Sean Gaines on them; checks to Gaines's son's printing business; and the cover letter found in Gaines's computer. Moreover, William Galvin directly testified as to the existence of an agreement and the various ways he acted in furtherance of that agreement.
 
 
 49
 Finally, the out-of-court statements themselves could have been taken into consideration by the district court in its determination. Bourjaily, 483 U.S. at 181. Galvin's and Paisley's recorded conversations with each other reflect an agreement, with Gaines's knowledge, to give Galvin and Paisley beneficial information and services, while Gaines received amenities from them. All of this evidence provided ample support for the district court's decision, that under the preponderance of the evidence standard, a conspiracy existed.
 
 
 50
 Gaines further argues that procedurally, because the district court never determined that the conspiracy existed and because the record does not reflect the district court's consideration or determination of the admissability of the out-of-court statements, he should get a new trial. In United States v. Blevins, 960 F.2d 1252 (4th Cir. 1992) however, we held that a district court need not have set out in the record its rationale for admitting this evidence into trial, as long as the record is complete enough to show that the statements were plainly admissible as was the case here. Blevins, at 1256.
 
 IV. Conformance with Navy Regulations
 
 51
 Gaines next argues that he conformed with Navy regulations concerning the accepting of gratuities when he received the Lonesome Whistle lithograph from Paisley, so he could not have had the requisite intent to violate 18 U.S.C. § 201(c)(1)(B). This is particularly so, contends Gaines, considering his earlier argument on the ambiguity of the intent element in § 201(c)(1)(B). Specifically, Gaines contends that he complied with Paragraph 13 of the NRAC Manual, which was applicable to his conduct. The general regulation concerning acceptance of gratuities in the NRAC manual provides:
 
 
 52
 m. Gratuities, Reimbursements, and Other Benefits from Outside Sources. DoD personnel and members of their families shall not accept gratuities from those who have or seek business with the Department of Defense or from those whose business interests are affected by DoD functions.
 
 Paragraph 13 of that section excepts
 
 53
 (13) customary exchanges of gratuities between DoD personnel and their friends and relatives and the friends and relatives of their spouse, minor children, and members of their household when the circumstances clearly indicate that it is the relationship, rather than the business of the person concerned, that is the motivating factor for the gratuity and it is clear the gratuity is not paid for by the United States Government or any other DoD contractor.
 
 
 54
 Gaines states that the evidence at trial showed he received the lithograph as a result of Paisley's friendship and that Paisley paid for it out of his own personal funds. The argument goes that such conformance with the regulation means he had no intent to violate § 201(c)(1)(B).
 
 
 55
 This regulation, however, does not change the law with respect to Gaines's taking of an illegal gratuity. The law was as given to the jury, and we are of opinion that it was correct. We have also held that, as a matter of law, there was sufficient evidence for the jury to have found that Gaines had the knowledge required to return a guilty verdict against him on the § 201(c)(1)(B) charge. The question of Gaines's intent was a jury question, and the refusal by the district court to hold that compliance with the regulation was a defense was not error.
 
 V. The Conversion Offense
 
 56
 Gaines next argues that the evidence was insufficient for the jury to have found him guilty of converting government property under 18 U.S.C. § 641. This count charged Gaines with giving a copy of the out-briefing papers of the NRAC summer study of 1987 to Paisley, at Paisley's request. Gaines argues that he lacked the requisite intent to have converted these documents because he believed that Paisley had the security clearance to see them and because he believed he had the authority to release them to Paisley.
 
 
 57
 The government was required to prove that Gaines conveyed the NRAC study to Paisley, knowing that he did not have the authority to do so.[5] Taking the facts in the light most favorable to the government, we are of opinion that there was sufficient evidence Gaines had the required intent for the jury to have found that he converted these documents.
 
 
 58
 Gaines admitted that he gave a copy of the NRAC summer study to Paisley. Gaines also admitted that he knew Paisley no longer had a Navy security clearance, only clearances through his defense contractor clients. Gaines was moreover aware that the NRAC manual prohibited disclosure of NRAC papers without authorization of the Executive Director. Gaines never received that authorization and admitted that he had not nor had sought it. Finally, when interviewed by government agents, Gaines denied giving any classified documents to Paisley, and told the agent at that time that NRAC studies were not to be disclosed outside of Navy channels.
 
 
 59
 Taken as a whole, there was substantial evidence that Gaines knew that he converted these documents without authority, and accordingly, the jury's verdict is sustained.
 
 VI. Travel Act Convictions
 
 60
 Gaines next argues that his convictions for violation of the Travel Act under 18 U.S.C. § 1952 should be reversed.
 
 A.
 
 61
 His first rationale is that he only received, never placed, the phone calls he was indicted for under this statute, and thus his convictions should be reversed. This argument is without merit.[6] The Travel Act, in relevant part, provides:
 
 
 62
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with the intent to-
 
 
 63
 ....
 
 
 64
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
 
 
 65
 ....
 
 
 66
 18 U.S.C. § 1952(a)(3). On its face, the Travel Act prohibits the use of a facility in interstate commerce, such as a telephone, and does not distinguish between a receiver or initiator. Moreover, we agree with the cases which have applied the Travel Act to a recipient of phone calls. See, e.g., United States v. Wilkinson, 601 F.2d 791, 796 (5th Cir. 1979); United States v. Chambers, 382 F.2d 910, 914 (6th Cir. 1967).
 
 
 67
 Gaines cites United States v. Archer, 486 F.2d 670, 683 (2nd Cir. 1973), for the proposition that the receipt of an interstate telephone call does not amount to a violation of § 1952(a). 486 F.2d 670, 683 (2d Cir. 1973). That case, however, was decided on a limited factual situation in which a federal agent participated in each of the telephone calls, with the court holding only that a stricter standard would be used when federal agents, not wholly the defendants, furnished the federal element under the Travel Act. 486 F.2d 685-86 (denial of petition for rehearing). The Archer case is thus distinguishable from the instant case, and accordingly, Gaines's argument fails.
 
 B.
 
 68
 Gaines argues in the alternative that 18 U.S.C.s 201(c)(1)(B) (illegal gratuity) cannot serve as a predicate offense to a Travel Act conviction. Gaines contends that the Travel Act's definition of the required underlying unlawful activity, in its plain language, refers to bribery,[7] not the taking of an illegal gratuity, which he argues has been traditionally considered a separate offense. Thus, he contends, § 201(c)(1)(B) cannot serve as the predicate offense for a Travel Act conviction. He further argues that any ambiguity in the Travel Act should be decided in his favor under the rule of lenity.
 
 
 69
 The Second Circuit has decided this very point and concluded that an illegal gratuity offense can serve as a predicate to a Travel Act conviction. United States v. Biaggi, 853 F.2d 89 (2d Cir. 1988), cert. denied, 489 U.S. 1052 (1989). We are persuaded that the outcome reached by the Second Circuit is the correct one, and that the district court did not err when it allowed § 201(c)(1)(B) to be used as a predicate offense to Gaines's Travel Act counts. Contrary authority has not come to our attention.
 
 VII. Conduct of Proceedings
 
 70
 Gaines's final argument concerns the district court's conduct of the proceedings before and during trial. We have considered these assignments of error, and are of opinion there was no reversible error.
 
 
 71
 Accordingly, the district court's judgment of acquittal as to Count II of Gaines's offenses is reversed, and the verdict of the jury is reinstated. All other convictions are affirmed; the sentence imposed is vacated; and the case is remanded to the district court for reinstatement of the conviction on Count II and for resentencing.
 
 
 72
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING
 
 
 
 [1]
 Apparently referring to equivalent pay grade, not rank, the Navy's one star flag rank being Commodore (a war-time rank). A two star Rear Admiral, lower half, is equivalent to a one star Brigadier General in the Army
 
 
 [2]
 Gaines only filed the Rule 29(c) motion as to Count II because it was the sole Sentencing Guidelines offense for which Gaines had been convicted
 
 
 [3]
 Because Gaines was acquitted of the conspiracy charge, we agree with him that we cannot consider the other co-conspirator's hearsay statements admitted under Fed. R. Evid. 801(d)(2)(E) in determining whether there was substantial evidence to support his convictions. United States v. Arrington, 719 F.2d 701, 703 n.3 (4th Cir. 1983), cert. denied, 465 U.S. 1028 (1984)
 
 
 [4]
 Under the Supreme Court's decision in Bourjaily v. United States, the court must conclude that there was a conspiracy involving the declarant and the party against whom admission of the evidence is sought, and that the statements at issue were made during the course of and in furtherance of the conspiracy. 483 U.S. 171, 175 (1987)
 
 
 [5]
 This statute provides, in relevant part:
 Whoever embezzles, steals, purloins, or knowingly converts to his use, or use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof; ...
 ....
 Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.
 ....
 18 U.S.C. § 641
 
 
 [6]
 Gaines did not raise this argument in the district court, so we will review it under a plain error standard. United States v. Bornstein, 977 F.2d 112, 115 (4th Cir. 1992)
 
 
 [7]
 The Travel Act defines "unlawful activity," in relevant part, as "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." 18 U.S.C. § 1952(b)(2)