35 F.3d 558
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Garcay WILLIAMS, Defendant-Appellant.
 No. 93-5946.
 United States Court of Appeals, Fourth Circuit.
 Argued July 15, 1994.
Decided Sept. 6, 1994.
 
 Appeal from the United States District Court for the District of South Carolina, at Greenville. G. Ross Anderson, Jr., District Judge. (CR-93-190)
 Benjamin Thomas Stepp, Asst. Fed. Public Defender, Greenville, S.C., for appellant.
 Harold Watson Gowdy, III, Asst. U.S. Atty., Greenville, S.C., for appellee.
 On Brief: J. Preston Strom, Jr., U.S. Atty., David C. Stephens, Asst. U.S. Atty., Greenville, S.C., for appellee.
 D.S.C.
 AFFIRMED.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Garcay Williams appeals his conviction for attempted unarmed bank robbery, alleging several errors in the conduct of his trial. We affirm.
 
 I.
 
 2
 At about 4:45 p.m. on April 23, 1993, a black male entered the First Union Bank in Greenville, South Carolina, and handed a teller a note scribbled on the back of a pay stub. The teller, Dawn Whitmire, could not initially decipher the writing. Whitmire told the man that she could not read the note and tried to return it to him. At the man's urging, she reexamined the note and finally realized its message: "This is a robbery. Give me 2-0-0-0." Feigning ignorance, Whitmire again told the man that she could not read the note; the would-be robber left without taking any money. Although the man had been carrying a jacket, neither Whitmire nor the other teller, Debra Hunter, saw a gun during the encounter. The bank employees called the FBI, which dispatched Agent Robert Hamod to investigate the incident.
 
 
 3
 A few minutes later, a nearby drugstore was robbed by a black male matching the description of the person who had tried to rob the bank. The robber held what appeared to be a revolver, but only the barrel was visible beneath a jacket draped over the robber's arm. He gave the clerk a note demanding money. The local police department assigned the case to Detective William Hoffman.
 
 
 4
 Hoffman learned of the attempted bank robbery and noted the similarity of the descriptions. He discovered that the FBI had constructed a videotape sequence of the surveillance pictures taken during the bank incident. Agent Hamod showed the tape to Hoffman. Hoffman, who happened to know Williams, immediately identified him as the man who had handed the note to Whitmire. Hamod obtained a photograph of Williams and went to the Greenville County Law Enforcement Center (LEC) to construct a photo array.
 
 
 5
 Hamod used a computer program to compile the array. The program was designed to identify persons on record with the LEC who matched a set of specified physical characteristics. Though no one at either the bank or the drugstore had described the perpetrator as having facial hair, Williams's photo depicted him wearing a mustache. Hamod thus limited his search of the LEC records to mustachioed black males, and constructed the array accordingly.
 
 
 6
 Hamod showed the array to Whitmire and Hunter. Hoffman showed a copy to Douglas Frazier, the drugstore clerk. Hunter immediately identified Williams; Whitmire and Frazier narrowed their choices to Williams and the third photograph in the array, but they were ultimately unable to distinguish between the two.
 
 
 7
 The grand jury charged Williams with attempting an armed bank robbery[1] and with carrying a firearm during and in relation to a crime of violence.[2] At trial, the surveillance tape and the photo array were shown to the jury. Detective Hoffman testified that, in his opinion, the surveillance tape depicted Williams. Whitmire, Hunter, and Frazier each testified concerning the result of his or her attempt to identify Williams from the photo array; Hunter also identified Williams in court. Agent Hamod and others filled in the details of the federal and state investigations.
 
 
 8
 The jury convicted Williams of attempted unarmed bank robbery; it acquitted him of the firearm charge. Williams appeals.
 
 II.
 
 9
 Williams maintains that Hunter's identification testimony was not reliable and that, as a result, the district court abused its discretion[3] in admitting it. Our analysis is governed by the test set forth by the Supreme Court in Neil v. Biggers, 409 U.S. 188 (1972). The Biggers Court listed five factors to be considered in evaluating the reliability of an eyewitness identification: (1)the opportunity of the witness to view the criminal at the time of the crime, (2)the witness's degree of attention, (3)the accuracy of the witness's prior description of the criminal, (4)the level of certainty demonstrated by the witness, and (5)the length of time between the crime and the confrontation. Id. at 199.
 
 
 10
 Applying the Biggers test to the facts of this case, we conclude that the balance weighs decidedly in favor of admission. Hunter was waiting on customers at the station adjacent to Whitmire's when the latter was passed the note. Hunter testified that Whitmire's protestations that the note was illegible caused her to become aware of the would-be robber's presence early on, and that she "got a good look" at his face for approximately five seconds. When, less than seventy-two hours following the incident, Agent Hamod showed her the array, she immediately and unequivocally identified Williams's photograph.
 
 
 11
 Only the third Biggers factor appears to favor Williams, inasmuch as the description that Hunter provided to the FBI made no mention of a mustache. However, on cross-examination, Hunter noted that Williams's mustache, as depicted in the array photo, "is so thin that I can understand why I didn't see it." Upon consideration of all the Biggers factors, we are convinced that Hunter's identification testimony was reliable enough to afford the district court discretion to admit it.
 
 III.
 
 12
 Williams also asserts that the district court improperly admitted Detective Hoffman's lay opinion testimony regarding the identity of the person in the surveillance tape. Because Williams failed to object at trial to Hoffman's testimony, we review only for plain error. See Fed.R.Crim.P. 52(b). To reverse, we must first find (1)error that is (2)plain and (3)affects substantial rights. United States v. Olano, 113 S.Ct. 1770, 1777-78 (1993). If these factors are present, we will correct the error if it "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. at 1779.
 
 
 13
 In United States v. Robinson, 804 F.2d 280 (4th Cir.1986), we held that "[a] lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." Id. at 282 (emphasis added).[4]
 
 
 14
 Prior to giving his opinion, Hoffman testified that he had known Williams for about six months before the bank incident. Thus, there was clearly "some" basis to conclude that, if Williams was the man in the surveillance tape, Hoffman was more likely than the jurors to correctly identify him. Consequently, the district court's admission of Hoffman's testimony fails to satisfy the most basic of Olano 's requirements--that there be error.
 
 IV.
 
 15
 Williams challenges the sufficiency of the trial evidence against him, based upon the failure of the police to recover either the firearm alleged by the indictment to have been used in the robbery attempt or the clothes supposed to have been worn by the perpetrator. The test is whether, by viewing the evidence in the light most favorable to the government, we may conclude that any rational trier of fact could have found the essential elements of the offense of conviction beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 16
 We would expect that the mere existence of a surveillance tape would ordinarily be sufficient, absent some defect in quality, to sustain a jury's conclusion that the defendant was the person who committed the crime recorded on it. That the government bolstered its surveillance evidence with lay opinion testimony does not compel us to reach a different conclusion in this case, in light of our rejection of Williams's challenge to that testimony. See Section III, supra. In short, the evidence in this case easily satisfied the Jackson standard.[5]
 
 V.
 
 17
 Finally, Williams alleges that the prosecutor's rebuttal argument deprived him of a fair trial. During its summation, the defense chose to comment on the inability of Whitmire and the drugstore clerk to distinguish Williams's array photo from the one at position number three:
 
 
 18
 I submit to you that the fact that two of these people who were closest to this perpetrator identified Number Three as a suspect, that's enough reasonable doubt right there. They had a suspect. They had two suspects. They slammed the door, closed the book and said, "We've got our man. It's Garcay Williams."
 
 On rebuttal, the prosecutor replied that
 
 19
 I want to get one thing perfectly straight for the last time. Agent Hamod sat up here and told you that he prepared [the array] at random. I asked both Agent Hamod and Agent [sic] Hoffman if Number Three was a suspect. They said no. You can infer from their answer[s] that they had a pretty good reason why they did not go out and look to see who Number Three was.
 
 
 20
 Williams contends that this last statement was, in essence, unsworn testimony of Number Three's innocence and, consequently, of his own guilt.[6] Because Williams neither objected to the prosecutor's remarks nor moved for a mistrial, we again review only for plain error. See Section III, supra.
 
 
 21
 We note initially that the prosecutor's recollection of the evidence was imperfect. On direct examination, Agent Hamod indeed began to testify about how he prepared the array. However, Williams objected, and after a sidebar conference, the prosecutor never returned to that line of questioning.
 
 
 22
 Likewise, the prosecutor never asked Agent Hamod whether the third man depicted in the array was a suspect. However, on cross-examination, defense counsel asked Hamod whether he knew the identity of Number Three. Hamod answered that he did not. The prosecutor correctly recalled Detective Hoffman's redirect testimony; Hoffman stated that Number Three was not a suspect.
 
 
 23
 Even were we to assume that the prosecutor's closing remarks constituted error that was plain enough for the district court to have corrected sua sponte, Williams has failed to demonstrate the presence of the third Olano factor--that the error affected substantial rights. "[I]n most cases, [the phrase'affecting substantial rights'] means that the error must have been prejudicial: It must have affected the outcome of the District Court proceedings." Olano, 113 S.Ct. at 1778. In light of the substantial evidence against him, Williams cannot show that the prosecutor's rebuttal argument affected the outcome of his trial in the slightest.
 
 
 24
 The judgment of the district court is affirmed.
 
 AFFIRMED
 
 
 [1]
 See 18 U.S.C. Sec. 2113(a), (d)
 
 
 [2]
 See 18 U.S.C. Sec. 924(c)(1)
 
 
 [3]
 Williams does not clearly indicate in the Standard of Review section of his brief whether he lodged a sufficient objection to Hunter's testimony at trial, although he suggests that he may not have: "[T]he Court of Appeals reviews on an abuse of discretion standard. Any failure to object to the testimony is further reviewed for plain error" (citations omitted). The corresponding section of the government's brief essentially quotes Williams's words verbatim and is of no assistance
 The trial transcript reveals that, as Hunter began to testify regarding the photo array, defense counsel interjected, "Subject to our previous motions and objections." Unfortunately, the record before us does not permit identification of the referenced motions and objections. The record does contain an excerpt from a pretrial hearing where Williams sought to suppress the photo array. However, the crux of counsel's argument at that time related to the potential suggestiveness of the array, an issue not pursued on appeal. In any event, we elect to give Williams the benefit of the doubt and review the admissibility of Hunter's identification testimony under the more stringent "abuse of discretion" standard.
 
 
 [4]
 The Robinson standard appears to be a situation-specific refinement of the requirements of Fed.R.Evid. 701, which states that lay opinion testimony is admissible where it is (1)rationally based on the perception of the witness and (2) "helpful" to a clear understanding of the witness's testimony or the determination of a fact in issue
 
 
 [5]
 Of course, the surveillance tape and Hoffman's testimony were not the only incriminating evidence. Hunter's unequivocal identification of Williams was sufficient in itself to allow the jury to convict him. See United States v. Arrington, 719 F.2d 701, 705 (4th Cir.1983) ("The uncorroborated testimony of one witness may be sufficient to sustain a verdict of guilty [citation omitted]. Whether it is sufficient ... depends on the probative force of the actual testimony."), cert. denied, 465 U.S. 1028 (1984)
 
 
 [6]
 We note that ruling out Number Three would not necessarily "rule in" Williams. The jury could have concluded that the real criminal had not yet been brought to justice--a "Number Seven," so to speak